HOLLAND & HART LLP
David K. Broadbent, #0442
Matthew T. Wirthlin, #8291
Romaine C. Marshall, #9654
J. Andrew Sjoblom, #10860
Doyle S. Byers, #11440
Cory A. Talbot, #11477
222 S. Main Street, Suite 2200
Salt Lake City, UT  84101
Telephone:  801-799-5960
Fax: 801-713-6259

*Attorneys for John A. Beckstead as Receiver*
*for Management Solutions, Inc., Wendell*
*A. Jacobson and Allen R. Jacobson*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>           Plaintiff,<br><br>vs.<br><br>MANAGEMENT SOLUTIONS, INC., a Texas Corporation; WENDELL A. JACOBSON; ALLEN R. JACOBSON,<br><br>           Defendants. | **MEMORANDUM IN SUPPORT OF MOTION FOR FINDINGS REGARDING THE EXISTENCE AND START DATE OF A PONZI SCHEME AND FOR APPROVAL TO POOL CLAIMS AND ASSETS**<br><br>Civil Action No. 2:11-cv-01165<br><br>Judge Bruce S. Jenkins |

John A. Beckstead, as receiver (the "Receiver") for Defendants Management Solutions,

Inc., Wendell A. Jacobson, Allen R. Jacobson, and related entities and persons (collectively,

"MSI"), respectfully submits this Memorandum in support of his Motion for Findings Regarding

the Existence and Start Date of a Ponzi Scheme and for Approval to Pool Claims and Assets (the "Motion").

## INTRODUCTION

The Receiver seeks a finding that a Ponzi scheme existed and establishing April 1, 1996 as the start date thereof for purposes of the administration of the receivership. This start date will be used for calculating claims filed by investors and to determine the amounts owing on certain claims to be brought by the Receiver.

The Receiver also seeks an order approving the pooling of assets and claims in this case. It is well established that pooling of assets and claims is common – in fact, it has become the norm – in equity receiverships when the funds of the defrauded victims were commingled and where the victims were similarly-situated with respect to their relationship to the defrauders. In this case, the commingling of investor funds was massive and extensive. The victims were all similarly-situated with respect to their relationship to Wendell Jacobson and his companies – they each expected their investment to be used to purchase a particular property, to receive regular interest payments from the operations of the property, and to receive a share of the profits when the property sold. The evidence of these facts is overwhelming and makes a compelling case for pooling of assets and claims.

The Receiver has advised the Court on several occasions, including in the Liquidation Plan of the Receiver filed on March 12, 2012 (Dkt. No. 223), that the Receiver intends, subject to approval of the Court, to pool all assets of the receivership into a common pool from which expenses will be paid and distributions made on a pro rata basis to all claimants according to priorities approved by the Court. This Motion seeks formal approval of the Court to do so.

2

## STATEMENT OF FACTS

1.     With the approval of the Court, the Receiver engaged Deloitte Financial Advisory

Services LLP ("Deloitte") as forensic accountants for the Receiver.

2.     At the request of the Receiver, Deloitte conducted an examination and

investigation of the records of the receivership companies to determine if there was commingling

of funds among the receivership companies.

3.     Deloitte issued a Report to Receiver of Management Solutions, Inc.

"Commingling" of Funds, dated November 2, 2012 (the "Commingling Report"), which was

filed with the Court on November 9, 2012 (*see* Doc. No. 661 and related exhibits through Doc.

No. 677).

4.     The Commingling Report found extensive, pervasive, and regular commingling of

funds among the receivership companies since at least April of 1996 and concluded that the

receivership companies were operated as a unitary enterprise, not as separate and distinct

investments.

5.     The Commingling Report also concludes that investors were paid from other

investors' funds in many, many cases.  "Example 2" in the Commingling Report details how J.

Robert Miller loaned $150,000 to a Jacobson-owned entity called Wool City, Inc. as a 30-day

note with an 18% interest rate.  (Commingling Report at p. 16, ¶ 26.)  The bulk of this money

was transferred to Thunder Bay, a Jacobson entity.  (*Id.*)  An investor entity called Colonial

Funding deposited $75,000 into a Thunder Bay bank account two days later.  (*Id.* at p. 16, ¶ 26.)

These funds, along with other funds deposited into the Thunder Bay account by Jacobson-owned

entities, were used to pay Gene and Mary Ann McDermott a $200,000 return in April 1996 relating to their investment in a property called Oak Trails.  (*Id.* at p. 17, ¶ 27.)

6.     Prior to their receipt of the $200,000 payment in April 1996, the McDermott's had invested $1.4 million in an entity called Squaw Springs, Inc., which purchased the Oak Trails property for $1.6 million in April 1995.  (Commingling Report at pp. 18-19, ¶ 29.)  The McDermotts received a second return on their investment of $100,000 in May 1996, paid by Thunder Bay, not Squaw Springs, Inc.  (Commingling Report at pp. 21, ¶ 32.)

7.     In July 1996, the Oak Trails property was sold to a straw buyer, Sherm Hill.  The McDermotts initially received $1.1 million as a result of this transaction from Squaw Springs, Inc.  (*Id.*)  However, the McDermotts subsequently received three more payments from Squaw Springs, Inc. totaling $374,164.88, but these funds cannot be traced to the sale of the Oak Trails property and appear to have been transferred to Squaw Springs, Inc. from other sources to pay the McDermotts.  (*Id.* at 21-22, ¶¶ 32-34.)

8.     Deloitte has reported that this is one of the earlier instances of investor funds being commingled and utilized to pay returns to other investors, and that Deloitte has uncovered similar transactions occurring regularly and frequently through the date the Receiver was appointed.  (*Id.* at p. 16, ¶ 25.)

9.     In the Commingling Report, Deloitte also reported that it "found many instances where the returns paid to investors upon the sale of a property were not funded by the sale transaction.  [Deloitte] saw instances of this dating back to 1996 and similar activity occurred regularly up to the appointment of the Receiver."  (*Id.* at p. 32, ¶ 53.)

10.     The Commingling Report details a particularly complex instance in which this occurred in 2005.  In April of that year, one MSI Investor Entity, Jake & Tate Properties, LP, sold its interest in the Dezavala Oaks property to another investor, BCW-D.O., LLC. (Commingling Report at p. 32, ¶ 54.)  While the sale occurred on April 8, 2005, the investors in the selling entity did not receive the proceeds from the sale until over two weeks later.  (*Id.*)  In the meantime, the purchase funds were commingled in Thunder Bay, used to pay one investor, Dennis May, a return of $16,739, and disbursed to other entities that were not investors in the Dezavala Oaks property.  (*Id.* at p. 33-34, ¶ 58.)

11.     As detailed in the Commingling Report, in order to pay the investors in Jake & Tate Properties, LP the proceeds that were due but that had been commingled and disbursed, "Thunder Bay utilized new funds from Third Party Investors, MSI Investor Entities and Jacobson Owned Entities."  (*Id.* at p. 36, ¶ 63.)  The Commingling Report details millions of dollars of transfers from new third party investors, MSI Investor Entities and Jacobson Owned Entities from April 21, 2005, through May 2, 2005, that were used to pay numerous third party investors as well as $4,700,000 to Jake & Take Properties, LP.[1]

12.     Another example from the Commingling Report is the sale of the McKamy Lakes property, which Deloitte calculates resulted in a $54,125 profit.  (*Id.* at 61, ¶ 108.)  Despite this meager profit, BC Warner Investments, LLC was paid its principal investment of $1,800,000 and a profit of $439,500 from funds originating from Thunder Bay.  (*Id*. at 62, ¶ 110.)  Another investor in the property, Alan Noall, was repaid his principal of $568,623.50 plus a profit of

---

[1] The payments to Jake & Tate Properties, LP were made in five transactions that occurred between April 22, 2005 and April 29, 2005, at least two weeks after the sale proceeds were received.  (Commingling Report at pp. 37-39, ¶ 64-68.)

$83,100.  (*Id.* at 63, ¶ 111.)  Mr. Noall was paid his principal and return eight months after the sale, and the funds he received flowed from Thunder Bay.  (*Id.*)

      13.    In his deposition, Wendell Jacobson confirmed the findings of the Commingling Report, including that investor funds were commingled, that investors were similarly-situated with respect to Wendell Jacobson and the receivership entities, and that investors were paid returns from other investors' funds.  (*See* the transcript of Wendell A. Jacobson's Deposition attached hereto as **Exhibits A** (Volume I, dated January 30, 2012) and **B** (Volume II, dated February 6, 2012) ("W. Jacobson Depo."))

      14.    In MSI's primary investment vehicle, a single purpose entity—typically a limited liability company—would hold title to real property.  (W. Jacobson Depo. at 494., Exhibit B.) MSI sold investors interests in the single purpose entity, usually through another investor entity. (*Id*. at 489.)  MSI's general practice was to have investors deposit funds into specific investor entity accounts.  (*Id*. at 488.)  MSI, however, sometimes instructed investors to deposit funds with non-investor entities wholly owned and controlled by Wendell Jacobson, for example, the entity known as Thunder Bay.  (*Id*. at 490.)

      15.    Investors were individuals and other entities, but the investors did not usually hold title to the property.[2]  (*Id*. at 494.)  Either MSI or an entity that Wendell Jacobson controlled

---

[2] There are a limited number of exceptions to this, where the investors were permitted to invest by obtaining a tenant-in-common ("TIC") interest in a properties that were partially owned and were managed by entities that are now part of the receivership estate.  The Receiver believes that, because funds were extensively commingled and because the MSI entities were operated as a unitary enterprise with all of the characteristics of a Ponzi scheme, all proceeds from the liquidation of Receivership property should be pooled and distributed to investors on a pro rata basis, without regard to whether an investor happened to have invested in a profitable property or an unprofitable property.   The Receiver believes that the TIC investors should be treated the same as the other investors because the commingling extended to the TIC properties.  In other words, the Receiver believes that the properties owned in part by TIC investors should be sold, the proceeds there from should be pooled with the rest of the assets of the receivership, and the TIC investors should participate in distributions from the pooled receivership estate on a pro

had an ownership in the properties.  (*Id*. at 502.)  Because the properties were income-producing

properties, usually apartment complexes, MSI served as the property manager and collected a six

percent management fee from the property.  (*Id*. at 495-96.)

16.     MSI's sales pitch was essentially the same for all investors.  Aside from

occasional, minor deviation, Wendell Jacobson courted his investors in the same way.  He

personally met with the investors, which he calls "partners:"

> Q.  In fact, did you meet with most partners prior to their
> investment?
>
> A.  Yes.

(W. Jacobson Depo. at 38, Exhibit A.)

17.     In these meetings, Wendell Jacobson—sometimes jointly with his son,

Allen Jacobson—would explain several "options" about specific properties in which the

investors could invest.  (*Id*. at 43-44.)  For each option, Wendell Jacobson explained that

investors could expect annual returns plus future returns upon the sale of the property.  (*Id*. at 45-

46; *see also id.* at 68.)  In making this pitch, Wendell Jacobson admitted that, in "most cases," he

told each investor "that [its] money would be used and put toward the actual property in which

they were investing."  (*Id*. at 47.)

18.     Wendell Jacobson made the decisions about how to finance the purchases and

negotiated with the lenders.  (W. Jacobson Depo. at 503, Exhibit B.)  Despite representing to

investors that their funds would be used to purchase a particular property, MSI mortgaged 85 to

90 percent of the properties it controlled.  (*Id*. at 475-76.)  In nearly all circumstances, MSI

managed the properties for an average management fee of 6 percent.  (*Id*. at 495-96 & 504-05.)

rata basis just as other investors will participate.  The Receiver anticipates submitting a separate filing(s) to request
approval from the Court of his proposed treatment of TIC investors.

In "nearly every situation" Wendell Jacobson told the investors that MSI would also be "putting a portion of [MSI's] money toward that apartment or property as well."  (W. Jacobson Depo. at 48, Exhibit A.)  MSI's contribution, however, was typically a zero-sum shell transaction where MSI transferred funds into the entity and then immediately loaned the funds to another MSI entity, or where MSI's contribution was nothing more than a promissory note.

19.     Wendell Jacobson's testimony about River Royal LLC, an investor LLC, illustrates MSI's zero-sum shell transaction method.  He testified that River Royal LLC, an investor LLC, was partially owned by Council Properties, an MSI controlled entity.  (*Id.* at 179 and 253.)  Council Properties purchased its interest in River Royal for $500,000, which River Royal immediately "loaned" back to Council Properties.  (*Id.* at 254-55.)  Similarly, at the end of 2009, River Royal owned interests in three other MSI entities, McKamy Lakes, Tuscany, and Wyndsor, but collectively owed the three entities $1 million.  (*Id.* at 255-56.)

20.     MSI's chief financial officer, Dustin Barrett, testified that, according MSI's accounting records, River Royal did not transfer the money into Council Properties, MSI simply entered into River Royal's books a $500,000 receivable from Council Properties.  (Transcript of Dustin Barrett's Deposition date January 23, 2012 ("Barrett Depo." at 216, attached hereto as **Exhibit C**.)  He also testified that River Royal purchased its interests in McKamy Lakes, Tuscany, and Wyndsor with a promissory note, never actually transferring money into those properties.  (*Id.* at 217.)  By the end of December 2009, River Royal had loaned Council Properties and Thunder Bay a combined $984,900.  (*Id.* at 216.)

21.     MSI also used MSI-controlled entities as depository locations for investor funds. Rather than put investor funds into the entity that owned the property, Wendell Jacobson either had investors deposit funds or transferred the funds into an entity entirely controlled by him:

> So a partner would generally put their money with Thunder Bay prior to a property closing, or prior to the formal organization of the LLC.  Then it would go from Thunder Bay to the LLC.

(W. Jacobson Depo. at 60, Exhibit A.)

22.     Once the funds were deposited with the entity, MSI used the funds in its own discretion, despite representing to the investors that the funds would go to a specific property. When investors deposited money directly into the property's entity, Wendell Jacobson transferred the money into Thunder Bay but told only "some" investors that MSI would transfer the money out of the property entity and into Thunder Bay.  (*Id.* at 59-60.)  While Wendell Jacobson testified that once the property entity purchased the property, the money was transferred from Thunder Bay into the entity, he used his controlling interests in property entities to loan the money back to Thunder Bay.  (*Id*. at 61.)

23.     MSI also used Thunder Bay as a transitional entity through which it paid investor returns in one project with investor funds from another project.  For example, often, when a property did not generate enough income to pay investors their guaranteed returns, Thunder Bay loaned the property entity the money to pay the returns.  (*Id*. at 93-94.)  When this happened, MSI did not disclose to investors that their returns were being paid from other entities rather than from rental income.  (*Id*. at 94.)

24.     MSI used its controlling interest in property entities to ensure a continuous stream of capital flowed into Thunder Bay.  Several times during his deposition, Wendell Jacobson

admitted that he caused investor entities that he controlled to loan money to Thunder Bay and did not tell the investors that he was using their funds for that purpose:

> Q.  Were investors in Brad Son told that Brad Son was making a
> $2.3 million loan to Thunder Bay?
>
> A.  I don't know.
>
> Q.  You never told them that Brand Son was making a $2.3 million
> loan to Thunder Bay, correct?
>
> A.  I don't remember telling them that.

(*Id*. at 219.)

25.     Regarding another loan by Brad Son to Thunder Bay, Wendell Jacobson testified,

> Q.  Were investors in Brad Son told that Brad Son was making a
> $2.9 million loan to Thunder Bay?
>
> A.  I don't know if they were.  I don't think I said anything.

(*Id*. at 221.)

26.     Wendell Jacobson caused another investor entity, D General, to make a $1.2 million loan to Thunder Bay, about which he never told investors.  (*Id*. at 225.)  He also loaned $2 million of investor funds in Mayo LLC to Thunder Bay without disclosing the loan to Mayo LLC's investors or telling them that he would use their investments for that purpose.  (*Id*. at 227.)  Typically, these loans were only documented in MSI's bookkeeping records and had no interest rate or fixed repayment term.  (Barrett Depo. at 88-89, Exhibit C.)

27.     Wendell Jacobson admitted that according to Thunder Bay's December 31, 2010, balance sheet, Thunder Bay owed at least $33 million to various investor LLCs.  (W. Jacobson Depo. at 229, Exhibit A.)  He also stated:

> Q.  And in each of these instances, you've also explained that the
> investors in the investor LLCs were not apprised that the investor

> LLCs were making loans to Council Properties and Thunder Bay, is that correct?
>
> A.  That's a statement I made, yes.

(*Id*. at 286.)

28.     At times, MSI loaned investor funds to Thunder Bay from investor or property entities, even though the loan depleted nearly all of the entity's funds.  MSI's treatment of River Royal illustrates this practice.

29.     In 2009, MSI loaned nearly every dollar of funds invested into River Royal to Thunder Bay within days of receiving the investment.  On April 16, 2009, an investor wrote a check to River Royal for $250,000, and the same day River Royal loaned $249,000 to Thunder Bay.  (W. Jacobson Depo. at 322-23, Exhibit B.)  On May 18, 2009, an investor deposited $100,000 in River Royal, and River Royal immediately loaned $99,000 to Thunder Bay.  (*Id*. at 324-25.)  For these loans, Wendell Jacobson admitted that, but for the investor's contribution, River Royal did not have sufficient funds to make the loans to Thunder Bay.  (*See id.*, respectively.)

30.     Wendell Jacobson further admitted that MSI used the investors' own funds to pay their guaranteed returns.  (*Id*. at 329-30.)

31.     MSI also structured shell repayment transactions.  For example, on December 30, 2009, Thunder Bay repaid $497,000 in loans from River Royal, then, on the same day, River Royal loaned Thunder Bay $484,900.  (*Id*. at 335-36; *see also* River Royal's bank statement attached as **Exhibit D**.)

32.     MSI used Thunder Bay as a shell to pass investors' funds from one entity to another.  In one example, discussed in Wendell Jacobson's deposition, he admitted that MSI

entities used loans from Thunder Bay to make proceed payments to investors.   (W. Jacobson Depo. at 340., Exhibit B.)  Wendell Jacobson testified that he caused investor funds to be transferred out of the investor LLC into Thunder Bay.  (*Id*. at 519.)  He also testified that MSI would use Thunder Bay to transfer money into an entity so that entity could pay investors their promised returns.  (*Id*. at 520.)

33.     In some cases, MSI loaned Thunder Bay investor funds that investors contributed for the purpose of acquiring property.  MSI did not use the funds to purchase property as represented to investors.  For example, when testifying about a series of transactions involving property in Memphis, Tennessee, Wendell Jacobson admitted that MSI's records show that it raised $2.4 million to purchase one property but loaned $2 million to Thunder Bay and other undifferentiated "Partners."  (*Id*. at 409.)  He also admitted that investor funds were not used to purchase the property.  (*Id.*)

34.     In a related transaction, MSI raised $1.6 million from investors, of which it loaned $1.4 million to Thunder Bay and other undifferentiated "Partners."  (*Id*. at 411.)

35.     In a third related transaction, MSI raised $3.4 million from investors and loaned $3.1 million to Thunder Bay and "Ins & Outs," an MSI account used to cycle money between entities.  (*Id.* 398 ; W. Jacobson Depo. at 142, Exhibit A.)  MSI raised over $7 million from investors to purchase these properties, but Wendell Jacobson admitted that MSI loaned nearly all of the $7 million to Thunder Bay and the undifferentiated Partners.  (W. Jacobson Depo. at 416, Exhibit B.)

36.     Although Wendell Jacobson insisted that MSI used some of these investor funds "to acquire and to take care of the management and to rehab the property," he could not point to any evidence of it at his deposition.  (*Id*. at 420-21.)

37.     To meet the guaranteed returns, MSI sold properties to other entities controlled by MSI or Wendell Jacobson.  MSI did not disclose that these were related-party transactions. Rather, it reported to investors as though the sales were arms-length transactions.  For example, Wendell Jacobson admitted during his deposition that MSI reported to investors in a March 2008 company newsletter that it sold two Ohio properties for 18 and 20 percent returns, respectively. MSI never reported to investors that both sales were actually to another MSI controlled entity. (*Id.* at 446, 452-53.)  Moreover, MSI intentionally structured the transactions to generate the reported returns.  (*Id*. at 451, 453.)  MSI then resold its interests in the properties to new investors, who Wendell Jacobson testified also were not told they were purchasing interests from an MSI entity.  (*Id*. at 451-54.)  In a January 2009 company newsletter, MSI reported that the sale of another property netted 17 percent annualized return.  This was, however, another sale to an MSI controlled entity where MSI was able to structure the transaction to generate whatever return it wanted.  (*Id*. at 455-56.)

38.     When MSI sold a property and the sale did not generate the promised returns, MSI used funds from other sources to pay the guaranteed returns.  For example, MSI's chief financial officer testified that when MSI's sale of a property called Park View Place did not generate a profit, Wendell Jacobson provided funds, either from his personal accounts or from other MSI-controlled entities, to meet the guaranteed returns.  (Barrett Depo. at 78-79, Exhibit C.)

39.     The investors were similarly-situated with respect to Wendell Jacobson and the receivership companies.  The investors intended and believed that their investment would be used to purchase a specific property, that they would receive a regular interest payment on their investment paid from the operating profits of that specific property, and that upon sale of the specific property, they would receive a portion of the profits from sale of that specific property. (W. Jacobson Depo. at 43-48, 68, Exhibit A.)

## ARGUMENT

**I.      THE COURT SHOULD FIND THAT MSI WAS OPERATING A PONZI SCHEME THAT BEGAN BY AT LEAST APRIL OF 1996**

A.      Ponzi Scheme Standard.

The Tenth Circuit has defined a Ponzi scheme as:

> an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments. Typically, investors are promised large returns for their investments.  Initial investors are actually paid the promised returns, which attract additional investors.

*Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84 F.3d 1330, 1332 n.1 (10th Cir. 1996) (citations omitted).  Deloitte has reported that from at least April, 1996, up through the date the Receiver was appointed, returns (often large returns) to investors were paid using funds obtained from new investors.

Deloitte has concluded as follows:

> Investor funds were frequently used for a purpose other than the purchase of real estate property.  Investor funds were utilized for a variety of purposes including to pay returns to other investors, to pay fees to Jacobson Owned Entities, to fund investments in outside ventures of Wendell Jacobson and his relatives, to pay for personal expenses of a Jacobson Family Member, and other items other than real estate investments.

(Commingling Report at p. 6, ¶ 12(4).)   Deloitte's report establishes the existence of a Ponzi scheme beginning at least in April 1996.  Deloitte has further concluded that "[s]ince April 1996, such commingling has occurred consistently up to the time the Receiver was appointed by the Court."  (*Id.* at p. 6, ¶ 14.)

B.    From April 1996 Forward, New Investor Money Was Used To Pay Returns To Existing Investors.

As explained in the Statement of Facts, and more fully in the Commingling Report, Deloitte has uncovered numerous transactions occurring with regular frequency where new investor money was used to pay returns to existing investors.

As an example, the McDermotts, for their investment in Squaw Springs, Inc. and the property known as Oak Trails, were paid returns generated from J. Robert Miller, Colonial Funding, and other sources, none of which were from the sale of the Oak Trails property.

This example, as well as the many others outlined in the Commingling Report, illustrates that MSI was running a classic Ponzi scheme.

C.    Upon The Sale Of Certain Properties, Investors Were Not Paid From Sale Proceeds, But Rather, From Other Sources, Including Money From New Investors.

As stated above, Deloitte reported that it "found many instances where the returns paid to investors upon the sale of a property were not funded by the sale transaction.  [Deloitte] saw instances of this dating back to 1996 and similar activity occurred regularly up to the appointment of the Receiver."

The examples of the proceeds paid to Jake & Tate Properties, LP and BC Warner Investments, LLC illustrate that investors were not paid from the sale of the properties in which they believed they were investing.

Based on Deloitte's findings and the corroboration from Wendell Jacobson's deposition testimony, the Court should find that MSI was operating a Ponzi Scheme that began in April 1996.

## II.   THE COURT SHOULD APPROVE THE RECEIVER'S REQUEST TO POOL ASSETS AND CLAIMS IN THIS CASE

The proceeds from the assets in this Receivership should be pooled and distributed on a pro rata basis among unsecured claimants pursuant to a priority approved by the Court.[3]  Pooling of assets with pro rata distribution of proceeds is a well-established and favored approach in equity receivership matters when circumstances like those present in this case exist.  In fact, it has become the norm.  *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88-89 (2d Cir. 2002).  Under a pooling approach, a receiver "pools collected proceeds, from all sources, then deducts expenses on a pro rata basis," and distributes a percentage of the proceeds to investors.  *See Commodity Futures Trading Comm'n v. Eustace*, No. 05-2973, 2008 WL 471574, at *3 (E.D. Pa. Feb. 19, 2008).

Pooling has become the favored approach because in most Ponzi scheme cases because the schemes are structured so that "earlier investor's returns are generated by the influx of fresh capital from unwitting newcomers rather than through legitimate investment activity."  *Credit Bancorp, Ltd.,* 290 F.3d at 89.  Thus, merely as a result of timing, some investors' assets may be traceable, but only because "the defrauders spent the money of the other victims first."  *Id.* (*quoting United States v. Durham,* 86 F.3d 70, 72 (5th Cir. 1996)).  Therefore, courts adopt an

---

[3] Secured claimants will be treated differently to the extent of the value of their collateral.  Any deficiency , if allowed, will be treated as an unsecured claim.  The Receiver will seek Court approval to treat tenant-in-common interests as unsecured claims.

"equality is equity" approach as between "equally innocent victims" and pool assets for pro rata

distribution.  *Cunningham v. Brown*, 265 U.S. 1, 13, 44 S.Ct. 424, 427 (1924).

     In *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80 (2d Cir. 2002), the Second Circuit reviewed

receivership case law and explained that courts consider two factors in determining whether to

pool assets and distribute them on a pro rata basis to investors, stating:

>     Courts have favored *pro rata* distribution of assets where . . . the
> funds of the defrauded victims were *commingled* and where
> victims were *similarly situated* with respect to their relationship to
> the defrauders.

*Id.* at 88-89 (emphasis added).  The facts of this case show both that the investors' funds were

extensively commingled and that the investors were similarly situated with respect to their

relationship to the Defendants.

     A.     The Investors' Funds Were Extensively Commingled In This Case.

     Under the commingling factor, courts looks at whether the defendant commingled

investor funds when operating the Ponzi scheme.  *Credit Bancorp*, 290 F.3d at 88-89.  Several

courts have held that "any commingling is enough to warrant treating all the funds as tainted."

*Sunwest*, 2009 WL 3245879 at *9 (citations omitted); *see also SEC v. Lauer*, 2009 WL 812719,

at *4-5 (S.D. Fl. March 26, 2009) (explaining that because money is fungible, the presence of

some tainted funds in an account is "sufficient to taint [all]") (citations omitted); *United States v.

Real Property Located at 13328 and 13324 State Highway 75 North,* 89 F.3d 551, 553-54 (9th

Cir. 1996) (justified pooling of funds that passed through multiple transactions for real estate

purchase where they were commingled with other funds at each transaction).  Moreover, a court

may also justify treating multiple companies as a single entity in a receivership proceeding where

a defendant "commingled funds between the various companies and had failed to maintain a strict separation of the companies[.]"  *SEC v. Elliott*, 953 F.2d 1560, 1565, n. 1 (11th Cir. 1992).

The Commingling Report uncovered extensive commingling in this case that was conducted for more than a decade.  Moreover, Wendell Jacobson admitted as much in his deposition.  Funds of each entity were treated interchangeably, without any regard for maintaining distinctions between the various entities and their respective investors.  Financial operations of the receivership companies were operated as a unitary enterprise.

B.     The Investors Are Similarly Situated.

Under the second factor identified in the *Credit Bancorp* case, whether investors are "similarly situated," courts determine whether defrauded investors were "similarly situated with respect to their relationship to the defrauders."  *Credit Bancorp*, 290 F.3d at 88-89 (citations omitted).  A pre-*Credit Bancorp* case explained that because similarly defrauded investors "occupy the same legal position" as other investors, "it would not be equitable to give some of them preferential treatment in equity."  *Elliott*, 953 F.2d at 1569-70.  While investors' circumstances need not be identical to be similarly situated, there should be a "reasonably close resemblance of facts and circumstances."  *SEC v. Byers*, 637 F. Supp. 2d 166, 179-80 (S.D.N.Y. 2009) (citation omitted).

To establish that investors are "similarly situated" or "occupy the same legal position," courts look to the specific facts of their case to show the similarities of the investors.  See *Elliott*, 953 F.2d at 1569 (investors in securities scheme "occup[ied] the same position" because all were defrauded and "cleverly persuaded to part with their securities."); *Byers*, 637 F. Supp. 2d at 180 (finding real estate investors were "similarly situated" because of defendants' common role to all

18

investments, the similarity of offering materials given to investors, the commingling of money between operations, and fact that the security offerings were backed by defendant capital).

The *Credit Bancorp* factors are not exclusive or mandatory, however, and a court may look to other reasoning to justify pooling. *See, e.g., SEC v. Amerifirst Funding, Inc.*, 2008 WL 919546, at *3-5 (N.D. Tex. March 13, 2008) (justifying pooling and pro rata distribution because "the separate legal entities were involved in a unified scheme to defraud.").   Ultimately, courts have "broad discretion in supervising an equity receivership." *SEC v. Black*, 163 F.3d 188, 199 (3d Cir. 1998) ("where there is a receiver with equitable power in a proceeding before it, the District Court has wide discretion as to how to proceed").

In this case, there is no question that there was substantial commingling of investors' funds.  As already established, the numerous entities were involved in a unified scheme. Wendell Jacobson structured the investments the same and made the same representations to the investors.  The investors each believed that they made investments in a specific entity related to a specific property, but their funds were commingled with monies from other investors, and their returns were paid from proceeds from other properties and/or from new funds from new investors.  The investors were similarly situated with respect to their the Defendants common role in each of their investments, and because they were each defrauded in the same manner.

Because the investors' funds were extensively commingled, and the investors are similarly situated, the Court should order that the assets of the receivership estate should be pooled, and the investors should receive pro rata distributions from the pooled estate.

## CONCLUSION

Based on the forgoing, the Receiver respectfully requests that this Motion be granted.

RESPECTFULLY SUBMITTED this 13th day of November, 2012.

HOLLAND & HART LLP

/s/  Doyle S. Byers
David K. Broadbent
Matthew T. Wirthlin
Romaine C. Marshall
J. Andrew Sjoblom
Doyle S. Byers
Cory A. Talbot
*Attorneys for John A. Beckstead as Receiver*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 13th day of November, 2012, I caused a true and correct copy

of the foregoing to be served in the following manner upon the addressee(s) listed below:

| | | |
|---|---|---|
| ☐ | U.S. Mail, postage prepaid | Daniel J. Wadley |
| ☐ | Hand Delivery | Thomas M. Melton |
| ☐ | Facsimile | Alison J. Okinaka |
| ☐ | Overnight courier | Paul N. Feindt |
| ☒ | E-mail and/or CM/ECF | SECURITIES & EXCHANGE COMMISSION |

                                              15 W. South Temple Street, Suite 1800
                                              Salt Lake City, UT  84101
                                                Telephone:  (801) 524-5796
                                                Facsimile:  (801) 524-5262
                                                wadleyd@sec.gov
                                                meltont@sec.gov
                                                okinakaa@sec.gov
                                                feindtp@sec.gov
*Attorneys for Plaintiff,*
  *Securities and Exchange Commission*

| | | |
|---|---|---|
| ☐ | U.S. Mail, postage prepaid | Stephen E. Quesenberry |
| ☐ | Hand Delivery | Christopher R. Infanger |
| ☐ | Facsimile | James B. Quesenberry |
| ☐ | Overnight courier | HILL JOHNSON & SCHMUTZ LC |
| ☒ | E-mail and/or CM/ECF | 4844 North 300 West, Suite 300 |

    Provo, UT  84604
    Telephone:  (801) 375-6600
    Facsimile:  (801) 375-3865
    squesenberry@hjslaw.com
    cinfanger@hjslaw.com
    jbquesenberry@hjslaw.com
*Attorneys for Defendants,*
  *Wendell A. Jacobson and Allen R. Jacobson*

| | | |
|---|---|---|
| ☒ | U.S. Mail, postage prepaid | Greg B. Bailey |
| ☐ | Hand Delivery | P. O. Box 298 |
| ☐ | Facsimile | Fountain Green, UT  84632 |
| ☐ | Overnight courier | Telephone:  (435) 262-7683 |
| ☐ | E-mail and/or CM/ECF | *Pro Se* |

| | | |
|---|---|---|
| ☐ | U.S. Mail, postage prepaid | Richard D. Burbidge |
| ☐ | Hand Delivery | Jefferson W. Gross |
| ☐ | Facsimile | Ian Hiatt |
| ☐ | Overnight courier | BURBIDGE MITCHELL & GROSS |
| ☒ | E-mail and/or CM/ECF | 215 S. State Street, Suite 920 |

Salt Lake City, UT  84111
Telephone:  (801) 355-6677
Facsimile:  (801) 355-2341
rburbidge@bmgtrial.com
jwgross@bmgtrial.com
ihiatt@bmgtrial.com
*Attorneys for Intervenor Defendant,*
  *CRVII Escena Lend, LLC*

| | | |
|---|---|---|
| ☐ | U.S. Mail, postage prepaid | Gregory N. Hoole |
| ☐ | Hand Delivery | HOOLE & KING, L.C. |
| ☐ | Facsimile | 4276 Highland Drive |
| ☐ | Overnight courier | Salt Lake City, UT  84124 |
| ☒ | E-mail and/or CM/ECF | Telephone:  (801) 272-7556 |

Facsimile:  (801) 272-7557
gregh@hooleking.com
*Attorneys for MSI Investor Group*

| | | |
|---|---|---|
| ☐ | U.S. Mail, postage prepaid | Kim R. Wilson |
| ☐ | Hand Delivery | Tammy B. Georgelas |
| ☐ | Facsimile | SNOW CHRISTENSEN & MARTINEAU |
| ☐ | Overnight courier | 10 Exchange Place, 11th Floor |
| ☒ | E-mail and/or CM/ECF | P. O. Box 45000 |

Salt Lake City, UT  84145-5000
Telephone:  (801) 521-9000
Facsimile:  (801) 363-0400
krw@scmlaw.com
tbg@scmlaw.com
*Attorneys for Intervenor Defendant,*
  *Bank Midwest N.A.*

| | | |
|---|---|---|
| ☐ | U.S. Mail, postage prepaid | Sam M. Stricklin |
| ☐ | Hand Delivery | Brian C. Mitchell |
| ☐ | Facsimile | BRACEWELL & GIULIANI, LLP |
| ☐ | Overnight courier | 1445 Ross Avenue, Suite 3800 |
| ☒ | E-mail and/or CM/ECF | Dallas, TX  75202 |

Telephone:  (214) 758-1053
Facsimile:  (214) 468-8353
Sam.stricklin@bgllp.com
brian.mitchell@bgllp.com
*Attorneys for Intervening Party Bank*
  *Midwest, N.A., as successor-by-merger with*
  *Hillcrest Bank, N.A.*

| | | |
|---|---|---|
| ☐ | U.S. Mail, postage prepaid | Adelaide Maudsley |
| ☐ | Hand Delivery | Brandon C. Pond |
| ☐ | Facsimile | CHAPMAN AND CUTLER, LLP |
| ☐ | Overnight courier | 201 S. Main Street, Suite 2000 |
| ☒ | E-mail and/or CM/ECF | Salt Lake City, UT  84111 |
| | | Telephone:  (801) 533-0066 |
| | | maudsley@chapman.com |
| | | bcpond@chapman.com |
| | | *Attorneys for Mutual of Omaha Bank* |

| | | |
|---|---|---|
| ☐ | U.S. Mail, postage prepaid | John Kincade |
| ☐ | Hand Delivery | Deanna E. Caldwell |
| ☐ | Facsimile | James Richard White |
| ☐ | Overnight courier | WINSTEAD PC |
| ☒ | E-mail and/or CM/ECF | 500 Winstead Building |
| | | 2728 N. Harwood Street |
| | | Dallas, TX  75270 |
| | | Telephone:  (214) 745-5400 |
| | | Facsimile:  (214) 745-5390 |
| | | jkincade@winstead.com |
| | | dcaldwell@winstead.com |
| | | jrwhite@winstead.com |
| | | *Attorneys for Mutual of Omaha Bank* |

| | | |
|---|---|---|
| ☐ | U.S. Mail, postage prepaid | Brandon C. Pond |
| ☐ | Hand Delivery | CHAPMAN & CUTLER |
| ☐ | Facsimile | One Utah Center |
| ☐ | Overnight courier | 201 S Main Street, Suite 2000 |
| ☒ | E-mail and/or CM/ECF | Salt Lake City, UT 84111 |
| | | (801) 320-6746 |
| | | bcpond@chapman.com |
| | | *Attorneys for Mutual of Omaha Bank* |

| | | |
|---|---|---|
| ☐ | U.S. Mail, postage prepaid | D. Zachary Wiseman |
| ☐ | Hand Delivery | RAY QUINNEY & NEBEKER, P.C. |
| ☐ | Facsimile | 36 S. State Street, Suite 1400 |
| ☐ | Overnight courier | Salt Lake City, UT  84111 |
| ☒ | E-mail and/or CM/ECF | zwiseman@rqn.com |
| | | *Attorneys for Movant Platinum Protection LLC* |

| | | |
|---|---|---|
| ☐ | U.S. Mail, postage prepaid | George W. Pratt |
| ☐ | Hand Delivery | Jessica P. Wilde |
| ☐ | Facsimile | JONES WALDO HOLBROOK & MCDONOUGH |
| ☐ | Overnight courier | 170 S. Main Street, Suite 1500 |
| ☒ | E-mail and/or CM/ECF | Salt Lake City, UT  84101 |

Telephone:  (801) 521-3200
gpratt@joneswaldo.com
jwilde@joneswaldo.com
*Attorneys for Barlow Corporation*

| | | |
|---|---|---|
| ☐ | U.S. Mail, postage prepaid | Douglas M. Durbano |
| ☐ | Hand Delivery | Jacob D. Driggs |
| ☐ | Facsimile | DURBANO LAW FIRM, P.C. |
| ☐ | Overnight courier | 476 West Heritage Park Blvd., Suite 200 |
| ☒ | E-mail and/or CM/ECF | Layton, Utah  84041 |

Telephone:  (801) 776-4111
office@durbanolawfirm.com
*Attorneys for Barlow Corporation*

| | | |
|---|---|---|
| ☐ | U.S. Mail, postage prepaid | Amy F. Sorenson |
| ☐ | Hand Delivery | Jared C. Fields |
| ☐ | Facsimile | SNELL & WILMER L.L.P. |
| ☐ | Overnight courier | 15 West South Temple, Suite 1200 |
| ☒ | E-mail and/or CM/ECF | Salt Lake City, Utah  84101 |

Telephone:  (801) 257-1900
asorenson@swlaw.com
jfields@swlaw.com
*Attorneys for Fannie Mae*

| | | |
|---|---|---|
| ☐ | U.S. Mail, postage prepaid | Jason D. Boren |
| ☐ | Hand Delivery | Matthew L. Moncur |
| ☐ | Facsimile | BALLARD SPAHR LLP |
| ☐ | Overnight courier | One Utah Center, Suite 800 |
| ☒ | E-mail and/or CM/ECF | 201 South Main Street |

Salt Lake City, Utah  84111-2221
Telephone:  (801) 531-3000
borenj@ballardspahr.com
moncurm@ballardspahr.com
*Attorneys for Freddie Mac*

☐ U.S. Mail, postage prepaid
☐ Hand Delivery
☐ Facsimile
☐ Overnight courier
☒ E-mail and/or CM/ECF

Edwin J. Tomko
Jason M. Ross
CURRAN TOMKO TARSKI LLP
2001 Bryan Tower, Suite 2000
Dallas, TX 75201
(214) 270-1405
etomko@cttlegal.com
jross@cttlegal.com
*Attorneys for Intervenors Brian Blain, Visionary
Management, First Branch and Encinito Properties*

☐ U.S. Mail, postage prepaid
☐ Hand Delivery
☐ Facsimile
☐ Overnight courier
☒ E-mail and/or CM/ECF

John H. Bogart
TELOS VENTURES GROUP
299 S Main Street, Suite 1300
Salt Lake City, UT 84111
(801) 535-4304
jbogart@telosvg.com
*Attorneys for Intervenors Brian Blain, Visionary
Management, First Branch and Encinito Properties*

☐ U.S. Mail, postage prepaid
☐ Hand Delivery
☐ Facsimile
☐ Overnight courier
☒ E-mail and/or CM/ECF

Kenneth L. Cannon, II
Steven J. McCardell
DURHAM JONES & PINEGAR
111 E Broadway, Suite 900
Salt Lake City, UT 84111
(801) 415-3000
kcannon@djplaw.com
smccardell@djplaw.com
*Attorneys for Intervenor Key Bank*

☐ U.S. Mail, postage prepaid
☐ Hand Delivery
☐ Facsimile
☐ Overnight courier
☒ E-mail and/or CM/ECF

Jeremy M. Hoffman
YOUNG HOFFMAN LLC
170 S Main Street, Suite 1125
Salt Lake City, UT 84101-1605
(801) 359-1900
jmhoffman@yahlaw.com
*Attorneys for Intervenor Arvest Bank*

☐ U.S. Mail, postage prepaid
☐ Hand Delivery
☐ Facsimile
☐ Overnight courier
☒ E-mail and/or CM/ECF

Philip D. Hixon
R. Charles Wilkin
Robert S. Glass
Robert P. Skeith
GLASS WILKIN PC
1515 S Utica, Suite 250
Tulsa, OK 74014
(918) 582-7100
phixon@glasswilkin.com
cwilkin@glasswilkin.com
rglass@glasswilkin.com
rskeith@glasswilkin.com
*Attorneys for Intervenor Arvest Bank*

☐ U.S. Mail, postage prepaid
☐ Hand Delivery
☐ Facsimile
☐ Overnight courier
☒ E-mail and/or CM/ECF

Matthew N. Evans
RAY QUINNEY & NEBEKER (SLC)
36 S. State Street, Suite 1400
PO BOX 45385
Salt Lake City, UT 84145-0385
(801) 521-1500
mevans@rqn.com
*Attorneys for Nevada State Bank*

☐ U.S. Mail, postage prepaid
☐ Hand Delivery
☐ Facsimile
☐ Overnight courier
☒ E-mail and/or CM/ECF

DAVID B. BARLOW
JEFFREY E. NELSON
185 South State Street, Suite 300
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
jeff.nelson@usdoj.gov
*Attorneys for Intervenor Department of Housing and Urban Development*

☐ U.S. Mail, postage prepaid
☐ Hand Delivery
☐ Facsimile
☐ Overnight courier
☒ E-mail and/or CM/ECF

Matthew C. Barneck
Wayne Z. Bennett
Richards Brandt Miller Nelson
Wells Fargo Center, 15th Floor
299 South Main Street
P.O. Box 2465
Salt Lake City, UT  84110-2465
matthew-barneck@rbmn.com
wayne-bennett@rbmn.com
*Attorneys for Naples Lending LLC*

          /s/ *Doyle S. Byers*

5646313_3