IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | Civil No. 2:11-CV-1165-BSJ |
| Plaintiff, | ) ) | **MEMORANDUM OPINION AND ORDER** |
| vs. | ) ) | |
| MANAGEMENT SOLUTIONS, INC., et al., | ) ) ) | |
| Defendants. | ) ) | |

<div style="border:1px solid">

**FILED**
CLERK, U.S. DISTRICT COURT
August 22, 2013 (9:46am)
DISTRICT OF UTAH

</div>

## INTRODUCTION

On November 13, 2012, the Receiver filed a Motion for Findings regarding the Existence and Start Date of an alleged Ponzi Scheme and for Approval to Pool Claims and Assets for administrative purposes of the receivership.[1] Namely, he asked the court to find a Ponzi scheme involving Management Solutions, Inc. ("MSI") existed beginning April 1, 1996, in order to calculate investor claims and pursue receivership claims in ancillary cases.[2] Further, the Receiver sought court approval to pool investor claims and assets for pro-rata distribution. After several pre-hearing conferences, a Joint Pre-Hearing Order was signed on May 24, 2013.[3] The order

---

[1] (Motion for Findings Regarding the Existence and Start Date of a Ponzi Scheme and for Approval to Pool Claims and Assets, filed November 13, 2012 (CM/ECF No. 685).)

[2] (Memorandum in Support of Motion for Findings Regarding the Existence and Start Date of a Ponzi Scheme and for Approval to Pool Claims and Assets, filed November 13, 2012 (CM/ECF No. 686).)

[3] (Joint Pre-Hearing Order Regarding Receiver's Motion for Findings Regarding the Existence and Start Date of a Ponzi Scheme, filed May 24, 2013 (CM/ECF No. 1103).)

denied the Jacobsons' standing to contest the issue as a party and bifurcated the issue of the existence and beginning of the Ponzi scheme and the pooling of assets.[4] The Receiver's motion came on for evidentiary hearing June 17, 2013, with the following appearances: Daniel J. Wadley appeared on behalf of Plaintiff, the Securities and Exchange Commission ("SEC"); Doyle S. Byers and Brent E. Johnson appeared on behalf of the Receiver, John A. Beckstead; Joseph Covey, Robert S. Clark and Royce B. Covington appeared on behalf of Intervenor Objectors, the McDermott family; and Matthew C. Barneck appeared on behalf of Intervenor Objectors, Matthew A. Nielson and Jill R. Nielson. Testimony and evidence was received, final argument was heard on June 20, 2013, and the matter was taken under advisement.

Having reviewed the testimony and exhibits received and considered the arguments of counsel, this court now denies the Receiver's limited motion and has chosen to elaborate upon the reasons for doing so.

## PROCEDURAL HISTORY

The Complaint in the above-entitled matter of the SEC was filed on December 15, 2011.[5] Among other things, the SEC alleged that the Jacobsons and MSI employed schemes or artifices "typical of a Ponzi scheme" in violation of Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1); committed fraud in the offer and sale of securities in violation of Sections 17(a)(2) and (3) of the Securities Act, 15 U.S.C. § 77q(a)(2) and (3); committed fraud in connection with the purchase and sale of securities in violation of Section 10(b) and Rule 10b-5 of the Securities

---

[4] (*Id.* at 2-3.)

[5] (Complaint, filed by Securities and Exchange Commission on December 15, 2011 (CM/ECF No. 1).)

Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5; offered and sold unregistered

securities in violation of Sections 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a) and (c);

and offered and sold securities by an unregistered broker or dealer in violation of Section 15(a) of

the Exchange Act, 15 U.S.C. § 78o(a).

Early on, at the instance of the SEC—which was seeking a temporary restraining

order—the court made the following findings:

> 2.     The commission has made a sufficient and proper showing in support of
> the relief granted herein as required by Section 20(b) of the Securities Act of 1933
> . . . and Section 21(d) of the Securities Exchange Act of 1934 . . . by evidence
> establishing a prima facie case of and a strong likelihood that the Commission
> will prevail at trial on the merits and that the Defendants, directly or indirectly,
> have engaged in and, unless restrained and enjoined by order of this Court, will
> continue to engage in acts, practices and courses of business constituting
> violations of Sections 5(a), 5(c), and 17(a) [of the Securities Act of 1933] . . . and
> Sections 10(b) and 15(a) of the Exchange Act . . . and Rule 10b-5 thereunder.[6]

The temporary restraining order was issued December 15, 2011.

On November 8, 2012, Wendell A. Jacobson consented to the relief sought by the SEC:

> 2.     Without admitting or denying the allegations of the complaint (except as
> to personal and subject matter jurisdiction, which Defendant admits),
> Defendant hereby consents to the entry of a Final Judgment in the form
> attached hereto (the "Final Judgment") and incorporated by reference
> herein, which, among other things:
>
> (a)     Permanently restrains and enjoins Defendant from violation of
> Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933
> ("Securities Act"), Sections 10(b) and 15(a) of the Securities
> Exchange Act of 1934 ("Exchange Act") and Rule 10b-5
> thereunder.
>
> (b)     Orders Defendant to pay disgorgement of $11,193,005 plus

---

[6] (Temporary Restraining Order, Order Accelerating Discovery and Order to Show Cause, filed December 15, 2011 (CM/ECF No. 3).) Interestingly, the SEC did not refer to claims of a Ponzi scheme in their motion for a TRO.

prejudgment interest thereon in the amount of $2,147,057.52 for a total of $13,340,062.52. Disgorgement shall be deemed satisfied by the Defendant turning over to the Court-appointed Receiver and relinquishing any interest, ownership, or claim to any and all assets and/or interests in any assets he holds and/or has held in the past, through December 15, 2011, together with any interest he holds and/or has held in any entity, directly or indirectly, through December 15, 2011, necessary to satisfy all Court-approved claims against the Defendants herein and any Receivership entity.

(c)     Orders Defendant to pay a civil penalty in the amount of $150,000 under Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act.

4.     Defendant waives the entry of findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

5.     Defendant waives the right, if any, to a jury trial and to appeal from the entry of the Final Judgment.[7]

The court thereafter entered a Judgment of Permanent Injunction and Other Relief Against

Defendant Wendell A. Jacobson on December 18, 2012.[8]

The Consent of Defendant Allen R. Jacobson was filed on November 8, 2012.[9]  Allen R.

Jacobson also consented to the entry of relief sought by the SEC:

2.     Without admitting or denying the allegations of the complaint (except as to personal and subject matter jurisdiction, which Defendant admits), Defendant hereby consents to the entry of a Final Judgment in the form attached hereto (the "Final Judgment") and incorporated by reference herein, which, among other things:

---

[7] (Consent to Entry of Judgement of Wendell A. Jacobson filed by Securities and Exchange Commission, filed November 8, 2012 (CM/ECF No. 655) at 1-2, 3.)

[8] (Judgment of Permanent Injunction and Other Relief against Defendant Wendell A. Jacobson, filed December 18, 2012 (CM/ECF No. 784).)

[9] (Consent to Entry of Judgment of Allen R. Jacobson filed by Securities and Exchange Commission, filed November 8, 2012 (CM/ECF No. 656).)

    (a)       Permanently restrains and enjoins Defendant from violation of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act"), Sections 10(b) and 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder.

    (b)       Orders Defendant to pay disgorgement of $4,462,073 plus prejudgment interest thereon in the amount of $855,920.94 for a total of $5,317,993.94.  Disgorgement shall be deemed satisfied by the Defendant turning over to the Court-appointed Receiver and relinquishing any interest, ownership, or claim to any and all assets and/or interests in any assets he holds and/or has held in the past, through December 15, 2011, together with any interest he holds and/or has held in any entity, directly or indirectly, through December 15, 2011.  Defendant's disgorgement obligation shall exclude Defendant's interest in his residential property and the furnishings therein located at 431 West 1430 South, Payson, Utah; Defendant's personal vehicles, including a 2008 BMW 528xi, VIN ending in 2705, and a 2005 Nissan Armada, VIN ending in 0918; and approximately $3,000 in cash, held in the savings accounts of his three minor children, account numbers ending in 4871, 9114, 4986, and 3228.

    (c)       Orders Defendant to pay a civil penalty in the amount of $150,000 under Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act.

4.      Defendant waives the entry of findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

5.      Defendant waives the right, if any, to a jury trial and to appeal from the entry of the Final Judgment.[10]

The court thereafter entered a Judgment of Permanent Injunction and Other Relief Against

Defendant Allen R. Jacobson, filed on December 18, 2012.[11]

---

[10] (*Id.* at 1-2, 3.)

[11] (Judgment of Permanent Injunction and Other Relief against Defendant Wendell A. Jacobson, filed December 18, 2012 (CM/ECF No. 783).)

On November 13, 2012, attorneys for the Receiver filed the instant motion and accompanying memoranda.[12]

## STATEMENT OF THE FACTS

### Uncontested Facts

In the Stipulated Pre-Hearing Order, the parties agreed to the following facts:

1. The Securities and Exchange Commission ("SEC") filed a complaint against Defendants Management Solutions, Inc., Wendell Jacobson and Allen Jacobson in this case on December 15, 2011, alleging, among other things, violations of federal securities laws and the operation of a Ponzi scheme. The SEC alleges that Defendants "have operated the investment program as a wide-scale Ponzi scheme since *at least* January 1, 2008." (Emphasis added.) The SEC makes claims, among others, that Defendants' operation of a Ponzi scheme violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77(q)(a)(1)] (Employment of a Device, Scheme or Artifice to Defraud); Section 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2)] (Fraud in the Offer and Sale of Securities); and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] (Fraud in Connection With the Purchase and Sale of Securities).

2. Final Judgments were entered against Defendants pursuant to the agreement of Defendants Management Solutions, Inc., Wendell Jacobson and Allen R. Jacobson.

3. From 1996 to 2011, there were extensive inter-company transfers and combining of money between and among Jacobson-owned or controlled entities.

4. The Jacobsons, through their various entities, engaged in substantial real estate-related business operations from 1996 to 2011, which operations generated tens of millions of dollars of revenue.

---

[12] (Motion for Findings Regarding the Existence and Start Date of a Ponzi Scheme and for Approval to Pool Claims and Assets, filed November 13, 2012 (CM/ECF No. 685); Memorandum in Support of Motion for Findings Regarding the Existence and Start Date of a Ponzi Scheme and for Approval to Pool Claims and Assets, filed November 13, 2012 (CM/ECF No. 686).)

5.      When the Receiver was appointed, the receivership estate included a large number of real estate-related properties and projects with more than 8,000 residential and commercial rental units, valued in the hundreds of millions of dollars.

6.      From 1996 to 2011, the Jacobsons routinely offered a return of 5%-8% per annum on loans and/or investments to Investors.

7.      Investors who invested with the Jacobsons or their entities in the mid to late 1990s were promised similar returns to Investors who invested with Jacobsons or their entities in 2010 and 2011.[13]

<u>Findings of Fact</u>

Wendell Jacobson was a real estate investor and real estate manager.[14] In 1991, he created MSI as a vehicle for his activities.[15]

The Jacobsons raised funds through a variety of avenues. Some "investors" were given property interests in the various MSI properties in return for money.[16] Others furnished loans with various interest rates and payment schedules.[17] "Investors," in various forms, were promised returns characterized as "interest" or as a "return of capital" with the appropriate K-1 or 1099 forms filed and furnished for tax purposes.[18] Some investors claimed shared depreciation on

---

[13] (Joint Pre-Hearing Order Regarding Receiver's Motion for Findings Regarding the Existence and Start Date of a Ponzi Scheme, filed May 24, 2013 (CM/ECF No. 1103) at 9-11.)

[14] (*See* Transcript of Evidentiary Hearing, dated June 17-20, 2013 ("Tr.") at 24.)

[15] (Tr. at 167.)

[16] (Tr. at 93-94. A number of exhibits were received in evidence during the hearing. Movant's exhibits are hereinafter cited as "MX-[number]"; MX-43.)

[17] (*See* Tr. at 274.)

[18] (MX-131; Tr. at 172-73.)

operating properties to shelter income as well.[19] The guaranteed promised "return" on an investment was five to eight percent,[20] whether the interest was on money "loaned" or was a "return of capital."[21] The anticipated gain on sale of property was a taxable capital gain.[22]

The Jacobsons created numerous business entities—over 208 in this matter—to manage properties and investor contributions.[23] According to information generally furnished to investors, each entity, for operating and tax purposes, purportedly was a stand-alone and independent entity.[24] According to representations and literature furnished by the Jacobsons, such independent entities were to rely on self-generated operational income to produce a five to eight percent promised return, as well as anticipated gain from sales of appreciated properties.[25]  Each "independent" entity maintained one or more bank accounts,[26] with the Jacobsons as signators,[27] on-site management contracted and delegated to the Jacobsons, management power exercised by the Jacobsons, and power of sale vested in the Jacobsons.[28]

---

[19] (Tr. at 456.)

[20] Five to eight percent is a good, if not high, return compared to today's typical savings account return of less than one percent.

[21] (Tr. at 27; MX-131; *see also* Tr. at 275, 291.)

[22] (Tr. at 455.)

[23] (Tr. at 134.)

[24] (*See* Tr. at 146-47.)

[25] (*See* Tr. at 171, 173-74.)

[26] (Tr. at 135.)

[27] (Tr. at 219.)

[28] (Tr. at 177, 179; MX-130.0004.)

The Jacobsons were very proud in telling investors that default had never occurred in the promised monthly return—whether called "return of capital" or "interest", and that early investors had profited from the sale of refurbished properties.[29]  Some early investors did indeed achieve a gain in cash or noted on the Jacobson-kept books on the sale of property.[30]  The Jacobsons worked hard to pay investors either directly, if requested, or by crediting their account.[31]

A problem would arise when a particular property was not self-sustaining, monthly promised "returns" had to be "paid", and account crediting alone was not good enough to satisfy investors.  Such payment of promised returns often came, not from an entity's own operations, but from new investors in a newly-created "stand-alone" investment entity, from borrowing on the assets of one entity to meet the obligations of another, or from selling a property owned by one Jacobson-controlled entity to another Jacobson-controlled entity to produce on paper a "profit" to the investors in the earlier entity.[32]  Peter often paid Paul's obligations.[33]

Each MSI investment property was expected to sell in three to five years, but in the interim, investors were to be paid or credited their monthly return, whether it sold or not during

---

[29] (Tr. at 175-76; *see also* Tr. at 367.)

[30] (*See* Tr. at 244.)

[31] (*See* Tr. at 175; MX-143.)

[32] (Tr. at 68, 226, 233-34, 244; *see also* Tr. at 233 (describing how everything was commingled, then split and commingled again in multiple accounts); Tr. at 459.)

[33] *See United States v. Cook*, 573 F.2d 281, 282 n.3 (5th Cir. 1978)

that time frame.[34]

While not always followed by the Jacobsons, there seems to have been a general pattern for raising money from MSI investors.[35] An "underperforming" apartment complex or other property would be located.[36] An investor LLC would be organized.[37]  A property-owning LLC would be organized.[38]  An investor would acquire a defined percentage in the investor LLC.[39]  The Jacobsons (or a Jacobson entity) would acquire a percentage interest in the investor LLC–often fifty percent, sometimes more or less—with the representation that, like the other investors, such was a cash investment by the Jacobsons (or a Jacobson entity).[40]  The investor LLC would then contribute capital to the property-owning LLC and own one-hundred percent of the property-owning LLC.[41]

The Jacobsons, when raising money, would promise investors a return of five to eight percent per annum, paid or credited monthly in the form of a "return of capital" or "interest" on money "invested," with year-end tax reporting forms, K-1 or 1099, and the tax benefits for

---

[34] (*See* Tr. at 239.)

[35] (MX-131.)

[36] (*See* MX-76; MX-93; MX-131.)

[37] (*See* MX-130.0003.)

[38] (*See* Tr. at 361.)

[39] (*See* Tr. at 67.)

[40] (Tr. at 28; MX-130.0003.)

[41] (Tr. at 26; *see also* MX-130.0003.)

depreciation—and if the property sold for a profit, capital gain at the fifteen percent tax rate.[42] In literature, the Jacobsons would represent that some properties when sold, coupled with the monthly payments, had produced gains from twelve to eighteen percent and more.[43]

There was usually a management contract with a Jacobson or Jacobson entity for which they were paid a fee (usually, not always, six percent) from the investor LLC or the property-owning LLC, or both.[44] The property acquired by the property-owning LLC was purportedly a stand-alone property with a separate bank account, and proceeds from the operation ran through that account.[45] Such was to generate the monthly "return" promised by the Jacobsons.[46]

The various separate entity bank accounts were all controlled by the Jacobsons.[47] The books and records of all of the entities were kept by the Jacobsons, or under their supervision and control.[48] "Underperforming properties" acquired often were in need of improvements and capital for such was often "built" into the capital contributions of the "investors", including the Jacobsons.[49] When they were not, working capital or acquisition capital needed to be acquired

---

[42] (Tr. at 172-73, 461.)

[43] (*See* Tr. at 515; MX-135.)

[44] (*See* Tr. at 312-13, 341-42, 454, 503.)

[45] (*See* MX-130.0007.)

[46] (*See* Tr. at 180-81, 186-87.)

[47] (MX-130.0004.)

[48] (Tr. at 26, 116, 219.)

[49] (*See* Tr. at 447-49.)

elsewhere.[50]

The Jacobsons owned a Texas corporation called Thunder Bay Mortgage, Inc. ("Thunder Bay"), which maintained multiple bank accounts in various banks.[51] Wendell Jacobson was the signator on those accounts.[52]

As a matter of practice—not always, but generally—the money invested in an investment LLC would not flow directly from the investment entity to a particular property LLC, but would first travel into Thunder Bay accounts where it would be commingled with monies from similarly-situated investment LLCs organized by the Jacobsons.[53] Purchase money as thus commingled would then flow back to the appropriate property LLC for use in completing a purchase or meeting various obligations, management fees, maintenance, or other obligations, such as the promised monthly "return" when repayment of contributions was requested.[54]

Promised monthly payments, if not otherwise credited to an investor account, would be transferred from Thunder Bay to a local account and paid out locally to the promised investor recipients.[55] If there was insufficient money from local operations, the investor account was augmented by funds from Thunder Bay so that promised payment or credits could be made.[56]

---

[50] (Tr. at 447-48.)

[51] (MX-125.)

[52] (*See id.*)

[53] (Tr. at 29-31; MX-002.0010; MX-130.0004)

[54] (*See* Tr. at 180-81, 219; *see also* MX-002.0024.)

[55] (*See* Tr. at 219.)

[56] (*See id.*; Tr. at 377.)

Those additional funds in Thunder Bay often came from other investors in different investor LLCs which had been organized by the Jacobsons with similar properties and similar promises.[57]

When the Jacobsons had promised to make a capital contribution to a particular investment entity, Thunder Bay would often transfer funds to the entity's account, immediately withdraw that payment the next day, and substitute on the books a bookkeeping entry showing that Thunder Bay had "borrowed" the sum and owed it to the entity, and on the Thunder Bay books show it as a "note payable".[58]  Yet, there were no physical notes payable, no payment date or dates on such notes or in the books, no interest rates—nothing but bookkeeping entries.[59]  The 2010 tax return showed Thunder Bay owed "notes payable" in excess of $103 million, mostly to MSI investment entities from which it had obtained money, newly organized LLC's into which new investors had contributed or old investors had rolled over old "gains" or investments into new entities as new money.[60]

There was a Jacobson practice which from time to time produced happy results for early investors and did so over a long period of time. For example, a property would be acquired by a particular group of MSI investors for a given price.[61] It was "improved."[62] It then needed to be sold to meet the expected limit of three-to-five year retention. A new MSI investment entity

---

[57] (Tr. at 259; *see also* MX-002.0017.)

[58] (Tr. at 29, 379; MX-130.0009; *see also* Tr. at 290; MX-130.0005.)

[59] (Tr. at 30, 185, 536; *see also* MX-130.00009-130.0010.)

[60] (*See* Tr. at 422, 428-29.)

[61] (*See* MX-130.0007.)

[62] (*See* MX-143; MX-130.0007.)

would be organized and funds raised from old and new investors.[63] The new investment entity

would buy the property to pay off the interests of the old investment entity with a "gain" to the

old investors and a higher base for the new investors.[64]  Wendell Jacobson, in control of the new

MSI entity, would make an offer to purchase the property, and Wendell Jacobson, in control of

the older MSI entity, would accept the offer as seller.[65] Often, the original investors, thus made

happy, would ask that their interest in the sales price be rolled over into yet another new

investment entity.[66] Bookkeeping entries would follow, but neither MSI entity's investors were

informed that they were dealing with another MSI entity.[67]

On occasion, the Jacobsons would find a property and have an associate arrange to

purchase the property as a straw buyer, with funds furnished by Wendell Jacobson (often through

Thunder Bay) and after the original purchase, the straw buyer would sell the same property at a

higher price to an entity organized by Wendell Jacobson with new investors, and often some of

the sales price would go to Wendell Jacobson or a Jacobson entity as a "finders fee".[68]

Other than for bookkeeping purposes, the Jacobsons treated the multitude of MSI

investment entities as a family, or in short, as one enterprise.[69] Generally, monies from multiple

---

[63] (*See id.*)

[64] (*See* Tr. at 244; *See* MX-130.0008.)

[65] (*See* Tr. at 506.)

[66] (*See* Tr. at 527.)

[67] (Tr. at 187.)

[68] (*See* Tr. at 35, 226, 327, 522, 537-38; MX-130.0011-130.0012.)

[69] (Tr. at 219.)

operations, banking, sales, and rents were swept into Thunder Bay accounts and divided up from there to meet the multiple demands of multiple MSI entities.[70]  Most funds from multiple sources were commingled in Thunder Bay and consequently most lost their individual identity as to source.[71]

It became a balancing act by Wendell Jacobson in which he became quite adept.  Of course, many investors were not aware that such commingling of funds was taking place.[72] Often, they concentrated on their own investment entity or a particular piece of property.[73]

The Jacobsons' balancing shuffle could not last indefinitely. By fall 2010, Thunder Bay became increasingly insolvent, and a confidential tip was given to the SEC, which triggered an investigation that led to the current case and receivership.[74]

<div align="center">

**ANALYSIS**

</div>

The issues raised before the court in this hearing are (1) whether the Jacobsons' investment scheme, MSI, can be classified, from the beginning, as a "Ponzi scheme", and, if so, (2) the start date of the Ponzi scheme.

The Receiver's purpose in pursuing the court's finding of the existence of a Ponzi scheme, beginning April 1, 1996, is to allow the Receiver to use that finding to invoke the "Ponzi

---

[70] (*See* MX-130.0005.)

[71] (Tr. at 232.)

[72] (*See* Tr. at 185-85.)

[73] (*See* MX-143.)

[74] (Tr. at 21, 75, 110, 130.)

presumption" in the forty MSI ancillary cases.[75] Under the Uniform Fraudulent Transfers Act

("UFTA"), "a defrauded creditor [or, in this case, the Receiver] may recover amounts transferred

from a debtor if the creditor [Receiver] can prove that the debtor made a fraudulent transfer of

assets and the transferee is not entitled to claim a statutory defense from liability." *Warfield v.*

*Carnie*, 2007 WL 1112591 at *9 (N.D. Tex.). To establish this claim, the Receiver must prove

"the debtor's actual intent to hinder, delay, or defraud." *See Wing v. Dockstader*, 2010 WL

5020959 at *4 (D. Utah). Under the "Ponzi presumption," "The mere existence of a Ponzi

scheme is sufficient to establish actual intent to defraud." *Donell v. Kowell*, 533 F.3d 762, 770

(9th Cir.2008) (quoting *In re AFI Holding, Inc.*, 525 F.3d 700, 703 (9th Cir.2008)); *see also In re*

*Indep. Clearing House*, 77 B.R. 843, 860 (D. Utah 1987) ("One can infer an intent to defraud

future undertakers from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other

reasonable inference is possible."). If the "Ponzi presumption" is used, the Receiver's burden of

proving intent to defraud shifts, and the transferee then has the burden of "establishing a statutory

defense from liability." *Warfield v. Carnie*, 2007 WL 1112591 at *9. In order to establish the

"Ponzi presumption", the Receiver must prove that a Ponzi scheme existed.

   Generally speaking, there is no absolute list of required elements for a Ponzi scheme. *See*

*Bear, Stearns Securities Corp. v. Gredd*, 397 B.R. 1, 12 (Bankr. S.D.N.Y. 2007). Rather, as the

bankruptcy court explained, "courts look for a general pattern, rather than specific requirements."

The general pattern courts look for when labeling a scheme as "Ponzi" is "any sort of inherently

fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment

---

[75] (*See* Tr. at 558.)

-16-

funds to pay off previous investors in order to forestall disclosure of the fraud." *In re Bayou Group, LLC*, 362 B.R. 624, 633 (Bankr. S.D.N.Y. 2007).

Similarly, the SEC defines a Ponzi scheme as

an investment fraud that involves the payment of purported returns to existing investors from funds contributed by new investors. Ponzi scheme organizers often solicit new investors by promising to invest funds in opportunities claimed to generate high returns with little or no risk. In many Ponzi schemes, the fraudsters focus on attracting new money to make promised payments to earlier-stage investors and to use for personal expenses, instead of engaging in any legitimate investment activity.

U.S. Securities and Exchange Commission, *Ponzi Schemes—Frequently Asked Questions* at http://www.sec.gov/answers/ponzi.htm (last visited June 18, 2013). The SEC also provides a list of "red flags" typically present in a Ponzi scheme:

- High investment returns with little or no risk,
- Overly consistent returns,
- Unregistered investments,
- Unlicensed sellers,
- Secretive and/or complex strategies,
- Issues with paperwork, and
- Difficulty receiving payments.

*See id*.

All descriptions of Ponzi schemes are patterned after, or at least reference, the infamous case of Charles Ponzi.

<u>The Original Ponzi Scheme</u>

In 1919, Charles Ponzi began "the business of borrowing money on his promissory notes." *Cunningham v. Brown*, 265 U.S. 1, 7 (1924). He told his would-be victims that he was purchasing international postal coupons and selling them for twice the price because of the turbulent foreign exchange rate following World War I. In exchange for their investment, Ponzi

promised a fifty-percent return of interest within ninety days. In fact, he paid many of these notes

in full within forty-five days, and he promised a full return of unmatured notes presented in less

than the forty-five days. Within eight months, Ponzi lured in thousands of investors, received

over $9 million, and promised to pay over $14 million. However, Ponzi never purchased any

stamps or used the investors' money for any other business venture; rather, he paid returns to

early investors with money received from new investors. In the following July, the public

authority began an investigation, which triggered a "bank run" on Ponzi's investment scheme and

withdrawals by some investors of some of the money.

Once Ponzi was declared insolvent, the bankruptcy receiver attempted to recoup funds

taken by those few investors who were successful in recouping their money. Recognizing the

unfortunate position that all investors faced because of the scheme, the Supreme Court stated:

> After August 2nd, the victims of Ponzi were not to be divided into two classes,
> those who rescinded for fraud and those who were relying on his contract to pay
> them. They were all of one class, actuated by the same purpose to save themselves
> from the effect of Ponzi's insolvency. Whether they sought to rescind, or sought
> to get their money as by the terms of the contract, they were, in their inability to
> identify their payments, creditors and nothing more. It is a case the circumstances
> of which call strongly for the principle that equality is equity, and this is the spirit
> of the bankrupt law. Those who were successful in the race of diligence violated
> not only its spirit but its letter and secured an unlawful preference.

*Id* at 13. As such, the Court reversed and required the bankruptcy court to treat the investors'

withdrawals as unlawful preferences. *See id.*

<u>First Circuit</u>

Shortly after the original Ponzi case, the First Circuit was presented with a similar

investment scheme in *Boyle v. Gray*, 28 F.2d 7 (1st Cir. 1928). In 1922, Frank Gordon entered

into the fox breeding business. To finance his fox ranch, he created contracts in which he would

-18-

sell to the contracting party a pair of foxes and up to two offspring, but he would continue to ranch the foxes.  Gray guaranteed that the foxes would produce at least two offspring (so that there would be at least the same number of foxes for the next mating season). If there were fewer offspring produced, Gray would supply extra foxes for the deficit. If there were more, Gordon would keep the extra foxes. Initially, Gray sold these contracts for $2000.00 per pair of foxes and guaranteed that the foxes "would produce 100 per cent. of the offspring for the first breeding season following the date of the contract." *Id*. at 8. After the first breeding season, Gordon had the option of buying the offspring for $1500.00 and to continue the contract until the next breeding season.

In reality, Gray considered the contracts to purchase a pair of foxes an investment in his entire fox industry. *Id.* at 17. Further, the fox pairs were not as productive as he anticipated: the foxes quarreled, refused to mate, and died of disease epidemics. Thus, his production rate was only around fifty percent, despite the fact he had promised many investors one-hundred percent production. However, when Gray exercised the option to buy the offspring for $1500.00, contract holders raved about the investment scheme, and demand for contracts soared. Meanwhile, Gray would buy new pairs of foxes for $700.00 to supply the market for new investors. In his dissent, Judge Anderson described the scheme as follows: "The earlier buyers of 'an undivided interest in [Gordon's] fox industry' got a 75 per cent. return on their investment, and consequently became enthusiastic advertisers of it; it was essentially Ponzi's scheme of paying the earlier comers huge profits from moneys furnished by the later comers." *Id,* at 17, citing *Cunningham*, 265 U.S. 1. Like Ponzi, Gray would pay the $1500.00 guarantee—or the interest on the investment—by

using the $2000.00 paid by later inventors who bought in because of the earlier buyers'

enthusiasm. *See id.* Thus, Anderson characterized the Gray's scheme as a Ponzi scheme. *See id.*

<div align="center">Second Circuit</div>

After seeing numerous Ponzi scheme cases, courts in the Second Circuit have adopted the

following description for a Ponzi scheme: "any sort of inherently fraudulent arrangement under

which the debtor-transferor must utilize after-acquired investment funds to pay off previous

investors in order to forestall disclosure of the fraud." *In re Bayou Group, LLC*, 362 B.R. 624

(Bankr. S.D.N.Y. 2007). They have also proffered this description: "[i]n [a Ponzi scheme],

money from new investors is used to pay artificially high returns to earlier investors in order to

create an appearance of profitability and attract new investors so as to perpetuate the scheme."

*Bear, Stearns Securities Corp. v. Gredd*, 397 B.R. 1, 8 (Bankr. S.D.N.Y. 2007) (citing *In re*

*Manhattan Fund Ltd.*, 359 B.R. 510, 517 (S.D.N.Y 2007)) (citing *Hirsch v. Arthur Andersen &*

*Co.*, 72 F.3d 1085, 1088 n.3 (2d Cir. 1995)).

The most famous Ponzi scheme to arise in the Second Circuit is the case of Bernie

Madoff. In 1960, Madoff formed Bernard L. Madoff Investment Securities LLC ("BLMIS"), a

broker-dealer registered with the SEC. *See In re Bernard L. Madoff Investment Securities LLC*,

424 B.R. 122, 127 (Bankr. S.D.N.Y. 2010). In 2006, BLMIS was registered with the SEC as an

investment advisor. "Outwardly, BLMIS functioned both as an investment advisor to its

customers and a custodian of their securities." Madoff alleged the consistent and large success of

these investments were based off of his "split-strike conversion strategy." *In re Bernard L*

*Madoff Investment Securities LLC*, 654 F.3d 229, 231 (2nd Cir. 2011). The Second Circuit

explained that "[t]he split-strike conversion strategy supposedly involved buying a basket of

<div align="center">-20-</div>

stocks listed on the Standard & Poor's 100 Index and hedging through the use of options." *Id.*

Because of the apparent success of his investments, "Madoff solicited billions of dollars of

investors" and made "[e]ntry into [his investment advisory business] coveted and selective, akin

to membership in an elite club. [The] aura of exclusivity, combined with the secrecy and reported

success of Madoff's investment strategies, [also] limited the transparency of the . . . [b]usiness to

prospective investors." *In re Bernard L. Madoff Investment Securities LLC*, 424 B.R. at 128.

   However, Madoff never invested customer funds. In fact, his business consisted of no

trading whatsoever. *See id.* Rather than invest the funds,

> Madoff used customer funds to support operations and fulfill other investors'
> requests for distributions of profits to perpetuate his Ponzi scheme. Thus, any
> payment of "profit" to a BLMIS customer came from another BLMIS customer's
> initial investment. Even if a BLMIS customer could afford the initial fake
> purchase of securities reported on his customer statement,  without additional
> customer deposits, any later "purchases" could be afforded only by virtue of
> recorded fictional profits. Given that in Madoff's fictional world no trades were
> actually executed, customer funds were never exposed to the uncertainties of price
> fluctuation, and account statements bore no relation to the United States securities
> market at any time. As such, the only verifiable transactions were the customers'
> cash deposits into, and cash withdrawals out of, their particular accounts.
> Ultimately, customer requests for payments exceeded the inflow of new
> investments, resulting in the Ponzi scheme's inevitable collapse.

*Id* at 128. After Madoff pled guilty to various federal charges, various courts in the Second

Circuit described Madoff's scheme as a classic Ponzi Scheme. The Second Circuit noted, "As is

true of all Ponzi schemes, Madoff used the investments of new and existing customers to fund

withdrawals of principal and supposed profit made by other customers." *In re Bernard L Madoff*

*Investment Securities LLC*, 654 F.3d at 232 (citations omitted).

> Madoff's scheme collapsed when the flow of new investments could no longer
> support the payments required on earlier invested funds. *See Eberhard v. Marcu*,
> 530 F.3d 122, 132 n.7 (2d Cir. 2008) (describing typical Ponzi scheme "where

-21-

earlier investors are paid from the investments of more recent investors . . . until the scheme ceases to attract new investors and the pyramid collapses").

*Id.* The bankruptcy court further noted that

BLMIS was insolvent at the time of the Constructive Fraudulent Transfers given that Ponzi schemes are, by definition, at all times insolvent. . . . see also *Cunningham v. Brown*, 265 U.S. 1, 8, 44 S. Ct. 424, 68 L. Ed. 873 (1924) (noting Charles Ponzi, the namesake of the Ponzi scheme, "was always insolvent, and became daily more so, the more his business succeeded. He made no investments of any kind, so that all the money he had at any time was solely the result of loans by his dupes.").

*In re Bernard L. Madoff Investment Securities LLC*, 458 B.R. 87, n.15 (Bankr. S.D.N.Y. 2011).

<u>Third Circuit</u>

Courts in the Third Circuit describe Ponzi schemes in the same manner as the Second Circuit, namely, "any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud." *In re Le-Nature's, Inc.*, 2009 U.S. Dist. LEXIS 85073 at *74 (W.D. Penn.) (citing *In re Manhattan Inv. Fund Ltd.*, 397 B.R. at 12) (quoting *In re Bayou Group, LLC*, 362 B.R. at 633)).[76]

---

[76] In 1992, Gregory Podlucky created Le-Nature's, Inc., a beverage bottling company. By "2005, [Le-Nature's] claimed to be producing nearly 60 different products. The growth in the alleged variety of products it sold purportedly spurred growth in its gross sales, net sales and profits." *Id.* However, reported sales were drastically overstated because Podlucky was running a Ponzi scheme. "Krones [another defendant] inflated prices on equipment for new Le-Nature's bottling lines and assisted Podlucky and the Insiders in securing financing based on these inflated prices." *Id.* Krones took inflated sales fees from the equipment purchases, and Podlucky "received excess revenue from the inflated pricing" and financing. *See id.* Further, "Podlucky and the Insiders . . . constantly rais[ed] money and incurr[ed] ever-increasing debts to refinance investors whole[,] cultivating the image of a legitimate profit-making business." *Id.* Eventually, minority shareholders filed suit against the company and Podlucky in the Court of Chancery in Delaware, the Ponzi scheme fell apart, and Le-Nature's filed for bankruptcy.

<u>Fifth Circuit</u>

In 1978, the Fifth Circuit first described Ponzi schemes as follows:

> In a Ponzi scheme, a swindler promises a large return for investments made with him. The swindler actually pays the promised return on the initial investments in order to attract additional investors. The payments are not financed through the success of the underlying venture but are taken from the corpus of the newly attracted investments. The swindler then takes an appropriate time to abscond with the outstanding investments. As one author has described it, "he borrowed from Peter to pay Paul. And it worked . . . until Peter got wise."

*United States v. Cook*, 573 F.2d 281, 282 n.3 (5th Cir. 1978).[77]

Later Fifth Circuit cases offer a variety of definitions for Ponzi schemes. In *Warfield v. Carnie,* 2007 WL 1112591 at *1 (N.D. Tex.), the Edwardses ran a two-year "prime bank investment" program known as the "Resource Development International Trading Program (RDI)." The Edwardses claimed to investors that the "prime bank investments" were "completely secure-transactions in foreign prime bank securities." *Id*. at *2.  This investment scheme was the child of the Dennel investment program, which had been deemed a Ponzi scheme by the SEC and was shut down in 1999.

> After the Dennel program was shut-down, the Edwardses and others began selling investments in RDI, their own trading program. Acting through [yet another separate entity], the Edwardses fraudulently collected millions of dollars from investors, which they, in turn, placed with the fraudulent Dennel program. From

---

[77] In *Cook*, Larry N. Cook defrauded European, not American, investors. *See id*. Cook advertised in various European countries investments in American oil wells and promised returns of thirty-nine to fifty-six percent, depending on the location of the well. "Once an European investor decided to purchase an interest in the American oil wells, a contract was signed in Europe by the investor and a confederate of Cook. The contract would be returned to Dallas and the agreement was recorded in the United States." *Id*. at 238. To attract investors, Cook would offer some the opportunity to inspect the oil wells in the States, and he paid others the promised returns. However, the advertised returns were grossly overstated, and the payments were funded by later investors. In 1976, the scheme failed, and Cook plead guilty to fraud and various securities violations.

> approximately January 1999 until at least September 2001, RDI collected more
> than $73 million from more than 1,300 investors from at least 34 different states.

*Id*. at *1.  However, "the type of investment program described to RDI investors never existed

and the payments that investors received were nothing more than funds provided by new

investors." The funds collected from RDI were initially used to pay investors from Dennel and

other failed investment programs. Funds were then directed to pay the earlier RDI investors.

Eventually, the Edwardses ran out of investors, and the scheme collapsed. In this case, the district

court relied on Ponzi scheme definitions from the Ninth and Tenth Circuits:

> A "Ponzi scheme" is a term generally used to describe an investment scheme that
> is not supported by any underlying business venture or investment opportunity but
> that has the illusion of profitability in order to recruit more investors and to
> sustain the program for the benefit of its operators. The operators induce investors
> into the program by promising exorbitant, unrealistic returns on their principal
> investments through lucrative investment opportunities or business ventures that
> often do not exist. *See In re M & L Business Machine Co.*, 59 F.3d 1078, 1080
> (10th Cir. 1995). Typically, the initial investors of the program are paid the
> promised returns from either the principal investments of new investors or their
> own principal investments. *In re United Energy Corp.*, 944 F.2d 589, 590 n. 1
> (9th Cir. 1991).

*Id*. at *12 n.10. Applying this description to the evidence presented during a summary judgment

proceeding, the court concluded that the Edwardses designed yet another Ponzi scheme in their

series of fraudulent investment programs.

In 1994, R. Allen Stanford began a fourteen-year, multi-billion dollar Ponzi scheme on

the premise that he was selling certificates of deposit in Stanford International Bank ("SIB").

*Janvey v. Alguire*, 628 F.3d 164 (5th Cir. 2010).  "Stanford achieved and maintained a high

volume of CD sales by promising above-market returns [between 12.7 and 13.39 percent] and

falsely assuring investors that the CDs were backed by safe, liquid investments. . . . In fact,

however, SIB had to use new CD sales proceeds to make interest and redemption payments on

pre-existing CDs, because it did not have sufficient assets, reserves and investments to cover its

liabilities." *Id.* at 169.  When the SEC shut SIB down in 2009, SIB reported $7 billion in assets

when, in reality, it had less than $1 billion in assets. In *Janvey*, the Fifth Circuit explained that

> [a] Ponzi scheme is a "fraudulent investment scheme in which money contributed
> by later investors generates artificially high dividends or returns for the original
> investors, whose example attracts even larger investments." BLACK'S LAW
> DICTIONARY 1198 (8th ed. 2004); *see also U.S. v. Setser*, 568 F.3d 482, 486 (5th
> Cir. 2009) ("in a classic Ponzi scheme, as new investments come in . . ., some of
> the new money is used to pay earlier investors"). The Second Circuit also provides
> a good description of a Ponzi scheme: A Ponzi scheme is a scheme whereby a
> corporation operates and continues to operate at a loss. ["]The corporation gives
> the appearance of being profitable by obtaining new investors and using those
> investments to pay for the high premiums promised to earlier investors. The effect
> of such a scheme is to put the corporation farther and farther into debt by
> incurring more and more liability and to give the corporation the false appearance
> of profitability in order to obtain new investors.["] *Hirsch v. Arthur Andersen &
> Co.*, 72 F.3d 1085, 1088 n.3 (2d Cir. 1995). This Circuit has found that a Ponzi
> scheme "is, as a matter of law, insolvent from its inception." *Warfield*, 436 F.3d at
> 558 (citing *Cunningham v. Brown*, 265 U.S. 1, 7-8, 44 S. Ct. 424, 68 L. Ed. 873
> (1924)).

*Id.* at 176. Based on this definition and the facts presented, the Fifth Circuit found that the district

court was correct in labeling this investment program a Ponzi scheme.

In 2012, the Fifth Circuit saw yet another oil-based fraudulent investment scheme.

*American Cancer Society v. Cook*, 675 F.3d 524 (5th Cir. 2012). Between 2007 and 2009, "Giant

Operating . . . raised approximately $13.4 million from investors through five unregistered

securities offerings . . . which promised considerable returns within twelve months." However,

instead of using only twenty percent of invested funds for managerial expenses, much of the

investor funds were funneled into an account which George Harris "devoted to personal expenses

unrelated to oil-and-gas programs." *Id.* at 526. "Harris also transferred millions of

dollars to defendants Plunkett and Giant Petroleum, another company Harris owned and

controlled. Based on these allegations, the SEC charged multiple violations of federal securities

laws." *Id.* at 526-27. In order to claw-back transfers made to various entities, including the

American Cancer Society, the receiver claimed that the investment scheme was "Ponzi-like" in

order to use the "Ponzi presumption" in various fraudulent transfer claims. The receiver

> attested that (1) investor funds constituted virtually all of Giant's revenue; (2)
> those funds were commingled and used for personal and unauthorized expenses;
> (3) Giant did not operate a profitable business outside of money received from
> new investors; (4) investor funds were used to pay "returns" to some investors;
> and (5) Giant used some of its funds to procure new investors.

*Id.* at 527-28. The receiver's argument was supported only by her affidavit, the SEC complaint,

and three exhibits. In holding the district court erred in finding a Ponzi scheme, the Fifth Circuit

quoted its earlier case as follows: "A Ponzi scheme is a 'fraudulent investment scheme in which

money contributed by later investors generates artificially high dividends or returns for the

original investors, whose example attracts even larger investments.'" *Id.* at 527 (citing *Janvey v.*

*Alguire*, 647 F.3d 585, 597 (5th Cir. 2011) (quoting BLACK'S LAW DICTIONARY 1198 (8th ed.

2004)). Because the SEC complaint could not be used as evidence, and because neither the

affidavit or the exhibits "demonstrate[d] that investor funds were used to issue 'returns' to other

investors--a *sine qua non* of any Ponzi scheme," the district court erred in finding a Ponzi

scheme.

<u>Ninth Circuit</u>

Beginning in the 1980s, the Ninth Circuit used the Fifth Circuit's borrowing-from-Peter-

to-pay-Paul analogy in identifying a Ponzi scheme, *e.g.*, *United States v. Rasheed*, 663 F.2d 843

(9th Cir. 1981). "In early 1977, Rasheed founded the Church of Hakeem." The Ninth Circuit

explained the precepts of this church as follows:

> Rasheed preached about the importance of a positive self-image through belief in
> one's self. He taught that one could achieve one's desires by focusing and
> concentrating on those desires. The central tenet of the Church was the belief in
> "the God within you." One of the aspects of the Church's beliefs was the law of
> increase, or the law of cosmic abundance, which provided that if one gave freely
> one would receive returns greater than the initial gift. Shortly after the Church was
> founded, Rasheed established the "Dare to be Rich" program. Rasheed preached
> that this program was consistent with the law of cosmic abundance. He taught that
> if one donated money to the Church, one would receive an "increase of God" of
> four times that amount within a particular period of time. The time period of the
> increase of God varied depending on the amount of the donation. Fourfold
> increases for donations of $1 to $249 were received in 70 days; increases for
> donations from $250 to $24,999 in 90 days; increases from $25,000 to $999,999
> in 9 months; and increases for donations of $1,000,000 or more in 3 years. These
> time periods were based on "psychic birth cycles," which Rasheed claimed had a
> basis in scripture. The cycles were supposed to coincide with levels of
> consciousness. The shortest cycle indicated that the donor had not transcended
> greed. Thus, donors were encouraged to give large amounts and to redonate their
> increases to the program to reach higher levels of consciousness.

*Id.* at 845-46. In order to participate in the "Dare to be Rich" program, potential members had to

pay an enrollment fee and become a "minister" in the church. Once a "minister," investors could

donate at gatherings called "celebrations." "At the end of an increase cycle, an 'increase letter'

stating the amount of the increase was prepared and given to the donor publicly at a celebration."

*Id.* at 846. If the minister wanted to withdraw the increase, the minister could meet with a Church

counselor who would pay the increase in cash but encourage donation of the increase.

> Rasheed was apparently very careful not to create the impression that a donation
> to the "Dare to be Rich" program created a legal obligation on the part of the
> Church to pay the increases of God. He instructed his aides never to tell potential
> donors that the Church was making any promise or guarantee of payment. He also
> instructed them not to use words like "security" or "stock." Nonetheless, many of
> his aides testified that Rasheed never indicated that there was any doubt that a
> donor would receive his increase.

*Id.* at 846. Rasheed originally claimed that the increases were profits made from investments in foreign oil, diamonds, and gold. As the scheme progressed, Rasheed refused to disclose the source of funds. In fact, "potential donors who questioned the source of the money were told they could not yet donate to the program because they lacked sufficient faith." *Id.* In reality, "increases" for earlier donations were paid by later donations. In 1979, the "Dare to be Rich" scheme failed, the IRS seized the church's assets, and Rasheem was indicted for mail fraud and other securities violations.

The Ninth Circuit concluded that "[t]he principal evidence of the fraudulent nature of the program, and of Rasheed's and Phillips' knowledge of the deceit, [was] the false impression they created concerning the source of the funds for the payments of the increases." *Id*. at 848. "If the truth had been revealed" that the source of funds was actually donations from later investors, the court argued, "a reasonably prudent person would have known that the 'Dare to be Rich' program was essentially a Ponzi scheme." *Id.*

More recently, the Ninth Circuit has defined a Ponzi scheme as "a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors." *In re Slatkin*, 525 F.3d 805, 809 n.1 (9th Cir. 2008) (quoting *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 759 n.1 (9th Cir. 2000)). The court has also described a Ponzi scheme as

> a financial fraud that induces investment by promising extremely high, risk-free returns, usually in a short time period, from an allegedly legitimate business venture. "The fraud consists of funneling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity

exists and inducing further investment." *In re United Energy Corp.*, 944 F.2d 589, 590 n.1 (9th Cir. 1991). *See generally Cunningham v. Brown*, 265 U.S. 1, 7-9, 44 S. Ct. 424, 68 L. Ed. 873 (1924).

*Donell v. Kowell*, 533 F.3d 762, n.2 (9th Cir. 2008); *See also Donell v. Ghadrdan*, 2013 WL 692853 at *1 (C.D. Cal.) (a Ponzi scheme is "any sort of fraudulent arrangement that uses later acquired funds or products to pay off previous investors").[78]

<u>Eleventh Circuit</u>

In 2011, an Eleventh Circuit bankruptcy court provided one of the more detailed descriptions of a Ponzi scheme:

> [a] phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors. *United States v. Silvestri*, 409 F.3d 1311, 1317 n. 6 (11th Cir. 2005). In order to prove the existence of a Ponzi scheme, the trustee must establish that: (1) deposits were made by investors; (2) the debtors conducted little or no legitimate business operations as represented to investors; (3) the purported business operations of the debtors produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors. *Wiand v. Waxenberg*, 611 F. Supp. 2d 1299, 1312 (M.D. Fla. 2009).

---

[78] The facts of *Kowell* and *Ghadrdan* fit these similar descriptions. In *Kowell*, Robert and his mother Edna claimed that investments in Wallenbrook—a company claiming "to provide working capital to Malaysian latex glove manufacturers"—would make "a 20 percent return in ninety days." *Donell v. Kowell*, 533 F.3d 762, 767 (9th Cir. 2008). The premise of Wallenbrock's enterprise was to purchase the "manufacturers' accounts receivables at a significant discount. . . . [and make] a 20 percent return when Wallenbrock collected the receivables from glove purchasers." *Id.* However, Robert and Edna did not buy the accounts receivables with the invested money as promised; rather, "the officers of Wallenbrock took the investors' money and used some of it to pay off earlier investors, some to pay for personal expenses, and some to invest in risky startup companies." *Id.* at 768. Eventually, the scheme collapsed, the SEC began an investigation, and Wallenbrock was declared a Ponzi scheme. Likewise, in *Ghadrdan*,  John Farahi used "investor funds [from his company, NewPoint Financial Services, Inc.] to make interest and principal repayments to previous investors, to pay personal expenses, and to finance higher-risk futures options." *Donell v. Ghadrdan*, 2013 WL 692853 at *1 (C.D. Cal.). His Ponzi scheme experienced a fate similar to the one in *Kowell*.

*In re ATM Financial Services, Inc.*, 2011 WL 2580763, at *4 (Bankr. M.D. Fla.) (Footnotes

included in paragraph).[79]

      Two recent bankruptcy cases in the Eleventh Circuit generally define a Ponzi scheme as

"paying existing investors with deposits from new and existing investors." *Wiand v. Morgan*,

2013 WL 247072 at *13 (M.D. Fla.). Although the bankruptcy receiver did not specify the exact

start date of the Ponzi scheme, the court concluded that between 1999 and 2009, Arthur Nadal

seriously misrepresented Scoop Capital, LLC's hedge fund performance:

> Nadel pooled funds received from investors and deposited into accounts,
> commingled these funds with other investors' money, and transferred the money
> from those accounts into other bank, brokerage, and trading accounts in which the
> money was further pooled and commingled with other investors' money. [An
> expert opined] that her review revealed that "Nadel pooled and commingled
> investors' monies regardless of with which Hedge Fund the monies had been
> invested; that Nadel not only commingled the monies in these accounts, he would
> also transfer funds into the brokerage accounts as necessary in order to have
> sufficient funds from which to pay redemptions; and that these funds would be
> transferred from the Hedge Fund brokerage account to the Hedge Fund bank
> account from which the investor would receive his or her redemption."

*Id.* at * 11. The expert further opined:

> Hedge Funds always had significantly less money in the financial accounts than
> the amounts deposited by investors. . . .  Nadel represented to investors that he
> had achieved high rates of return in order to induce investors to invest . . . and
> Nadel utilized investor principal to pay new investors, and . . . used investor
> monies from the hedge funds to pay for Traders' investors' redemptions.

---

[79] In 2004, Kapila claimed to be in the business of buying, selling, and managing ATM
machines and managed to raise over $80 million in investments. In reality, the ATM's Kapila
claimed to purchase, sell, and manage never existed. Instead, "withdrawal fees"—or returns on
the investment—were paid by new investors. Because no underlying business existed, the
scheme collapsed in 2008, the company was deemed a Ponzi scheme, and Kapila and his partner
served eight years in federal prison for wire fraud.

*Id.* Based on these facts, the court concluded that the receiver had sufficient evidence to prove

that Nadel had perpetuated a "classic Ponzi scheme."

In *In re World Vision Entertainment*, 275 B.R. 641 (Bankr. M.D. Fla. 2002), Jamie

Piromalli formed World Vision Entertainment, Inc., an entertainment investment company.

World Vision Entertainment sold unsecured notes that carried ten to twelve percent interest and

matured in nine months. At the end of the nine months, noteholders could collect the principal

and interest, but Piromalli frequently convinced noteholders to reinvest for an additional term. To

convince people to invest, "[Piromalli] produced and distributed slick, professional marketing

materials touting its business and describing the note program," which did not mention the risks

of the notes. *Id.* at 646. "Further, to allay concerns or quell any investor anxiety, investors

received certificates of insurance allegedly guaranteeing repayment." *Id.* However, Piromalli's

note program—which consisted of a large network of brokers and insurance agents—was too

complex and required too much overhead. In fact, the rate of return associated with the note

program was so high that "the debtor needed to generate a return of between 30.90 and 34.90

percent to pay these direct costs associated with the sale of the notes." *Id.*  Further, the companies

Piromalli invested in were mostly shams. Due to all of this, the bankruptcy court described the

scheme as "[a] textbook Ponzi scheme" and explained:

> None of the debtor's investments ever produced any income or revenue. The
> debtor's primary source of funds was through the sale of its promissory notes. The
> debtor used funds invested by new investors to make interest and principal
> payments to earlier investors. Any remaining funds were used to pay general and
> administrative expenses such as officer salaries and rent, to make occasional
> investments in companies not expected to generate any substantial return, and to
> enrich the debtor's insiders.

*Id.* at 648-49.

-31-

<u>Tenth Circuit</u>

In 1984, Judge Allen created a definition for a Ponzi scheme that has been generally used by courts in this Circuit for over three decades. He stated:

> A "Ponzi" scheme, as that term is generally used, refers to an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments. Typically, investors are promised large returns for their investments. Initial investors are actually paid the promised returns, which attract additional investors.

*In re Independent Clearing House Co.*, 41 B.R. 985, 994 n.12 (Bankr. D. Utah 1984) (citations omitted). In 1980, Independent Clearing House Co. began an investment scheme in which private investors would assume and pay the accounts payable of various companies. Allegedly, profits in the scheme consisted of "discounts negotiated with the creditors of the client companies and the sums repaid by the client companies." *Id.* at 993-94. While the investment scheme existed, "investors received contractual returns of" 8.4 percent. *Id.* But, "[n]o client companies existed whose accounts payable were paid by the debtors in accordance with the program as represented to investors, and no profits or earnings were ever produced by the purported accounts payable program." *Id.* Instead, returns were paid by the funds received from new investors. Because of this, the court concluded that the investment program was a Ponzi scheme "in which fictitious profits were paid to investors from the principal sums deposited by subsequent investors." *Id.*  Further, "[t]he debtors were insolvent from the moment of the execution of the first investor contract, and became more insolvent with each successive contract." *Id.* Because of the scheme, over nine-hundred investors "received no returns and lost all of their original

investments." *Id.* at 995. The scheme collapsed, Independent Clearing House Co. declared

bankruptcy, and multiple people were charged with various crimes, including racketeering.

Three years later, this court elaborated on this definition in an *en banc* consolidated

appeal from Judge Allen in the same case, *In re Independent Clearing House Co.*, 77 B.R. 843

(D. Utah 1987). The consolidated appeals arose out of numerous claims the bankruptcy trustee

had made in connection with recouping money from investors because of voidable preferences

and fraudulent transfers. In deciding that the receiver could recover some of the preferences and

transfers, this court quoted Judge Allen and noted that Ponzi schemes are inherently fraudulent:

> One can infer an intent to defraud future undertakers from the mere fact that a
> debtor was running a Ponzi scheme. Indeed, no other reasonable inference is
> possible. A Ponzi scheme cannot work forever. The investor pool is a limited
> resource and will eventually run dry. The perpetrator must know that the scheme
> will eventually collapse as a result of the inability to attract new investors. The
> perpetrator nevertheless makes payments to present investors, which, by
> definition, are meant to attract new investors. He must know all along, from the
> very nature of his activities, that investors at the end of the line will lose their
> money. Knowledge to a substantial certainty constitutes intent in the eyes of the
> law, *cf.* Restatement (Second) of Torts § 8A (1963 & 1964), and a debtor's
> knowledge that future investors will not be paid is sufficient to establish his actual
> intent to defraud them. *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank &
> Trust Co. (In re American Properties, Inc.)*, 14 Bankr. 637, 643 (Bankr. D. Kan.
> 1981) (intentionally carrying out a transaction with full knowledge that its effect
> will be detrimental to creditors is sufficient for actual intent to hinder, delay or
> defraud within the meaning of § 548(a)(1)).

Id. at 860. This court also noted that "[b]y definition, an enterprise engaged in a Ponzi scheme is

insolvent from day one." *Id.* at 871. Because of this, the transfers made to investors were

preferential and fraudulent.

Around the time the Independent Clearing House Co. collapsed, Perry S. McKay used his

computer sales company as a front for a Ponzi scheme. *Jobin v. McKay*, 84 F.3d 1330 (10th Cir.

-33-

1996). "[T]he M & L officers solicited investments by promising extremely high rates of return [in this case, at least ten percent per month]. Upon receiving money from investors, M & L issued promissory notes and paid the promised sums with postdated checks drawn on company accounts." *Id.* at 1331. Unfortunately, the company could not sustain such high rates of return, and in 1990, the company filed for bankruptcy, and the Ponzi scheme was discovered. In classifying McKay's scheme as a Ponzi scheme, the Tenth Circuit cited to Judge Allen's definition. *Id.*

While the case reached the Tenth Circuit in the same year as *Jobin*, the Ponzi scheme in *Sender v. Simon*, 84 F.3d 1299 (10th Cir. 1996), began in the late 1970s. At that time, Mr. Donahue created Hedged-Investment Associates to run the Hedged Investments investment fund. Donahue promised investors returns of fifteen to twenty-two percent based off of his "sophisticated, computer-based strategy for trading in hedged securities options." *Id.* at 1301. However, "Mr. Donahue failed to maintain separate accounting records for the Debtor Partnerships and commingled investors' funds into a single checking account held in the name of HIA Inc. . . . Mr. Donahue treated the investors as if they were direct participants in a single investment pool instead of investors in discreet limited partnerships." *Id.* at 1301-02. The Court further explained:

> [I]n most years the Hedged Investments operation realized net trading losses, and in all years Mr. Donahue substantially overstated the fund's performance. From 1982 onward the fund was insolvent in that its cumulative losses exceeded its cumulative gains. To prevent investors from discovering the fund's poor performance, Mr. Donahue falsely reported high earnings. When an investor sought to withdraw money from his account on the basis of these reported earnings, Mr. Donahue – because the fund had no real cumulative earnings – apparently paid the withdrawal from the capital contributions of other investors.

*Id.* In 1990, the scheme collapsed, Hedged Investment Associates filed for bankruptcy, and

Donahue was sent to federal prison. In describing this investment plan as a Ponzi scheme, the

Court cited Judge Allen:

> A Ponzi scheme is a fraudulent investment scheme in which "profits" to investors
> are not created by the success of the underlying business venture but instead are
> derived from the capital contributions of subsequently attracted investors. *Sender
> v. Nancy Elizabeth R. Heggland Family Trust (In re Hedged- Investments Assocs.,
> Inc.)*, 48 F.3d 470, 471 n.2 (10th Cir. 1995). For an informative discussion of
> Ponzi schemes and their namesake, Charles Ponzi, *see Merrill v. Abbott (In re
> Independent Clearing House Co.)*, 41 Bankr. 985, 994 n.12 (Bankr. D. Utah
> 1984).

*Id.* at n.1.

In 2008, the Tenth Circuit added another definition of Ponzi to its repertoire. In 2000-

2001, NSFF—a non-profit organization—began soliciting schools to purchase physical fitness

programs through NSFF's "Leasing Model." *Mosier v. Callister, Nebeker & McCullough, P.C.*,

546 F.3d 1271, 1273 (10th Cir. 2008). The Tenth Circuit described the "Leasing Model" as

follows:

> (1) NSFF solicited schools to purchase its physical fitness programs; (2) interested
> schools were directed to enter into a sales contract with a for-profit company
> organized by NSFF's principals, called School Fitness Systems, LLC ("SFS"); (3)
> the schools paid SFS directly and financed the purchase by obtaining a three-year,
> non-recourse lease from an institutional lender; (4) NSFF entered into a
> "contribution agreement" with each school through which NSFF contracted to
> make monthly payments to the school in an amount equal to the monthly lease
> obligation the school owed to its institutional lender; (5) after receiving payment
> from the schools, SFS kicked back approximately 50% of those proceeds to
> NSFF; (6) NSFF agreed to repay the schools the full purchase price for the
> physical fitness program over the course of the three-year lease and advertised the
> program as "free" to the schools.

*Id.* Although NSFF claimed funds for payments came from government grants and/or charitable

contributions, nearly all payments came from the proceeds of later sales to other schools.

> Under its Leasing Model, NSFF was therefore operating a fraudulent "Ponzi"
> scheme. Because it never had sufficient assets, grants, or charitable contributions
> to meet its obligations to the schools, and because the stream of revenue from
> SFS's sales to new schools was insufficient to fund NSFF's continuing
> obligations to previously solicited schools, NSFF incurred a mounting, unfunded
> liability that eventually led to its insolvency and petition for bankruptcy on June 1,
> 2004.

*Id.* In *Mosier*, the court defined a Ponzi scheme as follows:

> A Ponzi scheme is "[a] fraudulent investment scheme in which money contributed
> by later investors generates artificially high dividends for the original investors,
> whose example attracts even larger investments. Money from the new investors is
> used directly to repay or pay interest to earlier investors, usually without any
> operation or revenue-producing activity other than the continual raising of new
> funds." BLACK'S LAW DICTIONARY 1198 (8th ed. 2004).

*Id.* at 1273 n.2.

After *Mosier*, Tenth Circuit courts have followed a mix of *Mosier* and *Independent*

*Clearing House Co.*.

Before its collapse in 2007, Twin Peaks Financial Services Inc., was running a real estate

business dealing with properties in Utah and Salt Lake Counties. *Gillman v. Ponzi Issue*, 2012

Bankr. LEXIS 3763 (Bankr. D. Utah). Properties were acquired through hard money loans, Twin

Peak's bank accounts, and investors. Twin Peaks promised returns of fifteen to eighteen percent

to its investors. However, "The combination of the high interest rate plus the loan fees on such

short term investments resulted in extremely high promised rates of return for Investors which

equated to an effective annual rate of return of 30 to over 200 percent on the money loaned." *Id.*

at *8. Unfortunately, "the cash receipts from business operations was never sufficient . . . [to]

cover those amounts repaid to Investors. . . . [and] the only other source of funds which could

cover this discrepancy were funds received from other Investors, and it was apparent that the

Debtor had to rely on funds received from subsequent Investors to service the obligations owed to earlier Investors." *Id.* at *9.  As such, the scheme collapsed, and Twin Peaks filed bankruptcy in 2007. When classifying this as a Ponzi scheme, Judge Mosier cited to *Independent Clearing House Co.*, but added the following:

> Therefore, four characteristics of a Ponzi scheme include the following, all of which are present here:
>
>> a. The returns to investors were not financed through the success of the underlying business venture.
>> b. The returns to investors were taken from newly attracted investments.
>> c. Investors were promised large returns.
>> d. Initial investors received promised returns, which attracted additional investors.

*Id.* at *12. Because these four characteristics were found in the Twin Peaks scheme, Judge Mosier deemed it a Ponzi scheme.

In *In re Waterford Funding*, 2012 Bankr. LEXIS 873 (Bankr. D. Utah), Waterford Funding issued promissory notes with rates between eight and forty-four percent, with some default rates over three-hundred percent.  Wright promised that invested funds "would be deposited in a common fund and then loaned out on commercial real estate projects at no more than 50% loan to value ratio." *Id.* at *6-7. In order to cover the high interest rates, however, Waterford paid the interest rates with money from new investors. Relying on the *Black's Law Dictionary* definition, Judge Mosier found this scheme to be a Ponzi scheme and deemed it insolvent since 1999.

In *Okla Dep't of Sec. Ex rel. Faught v. Wilcox*, 691 F.3d 1171 (10th Cir. 2012), Martha Schubert was a registered agent in Oklahoma working for two companies. Unbeknownst to either

company, Martha was also "offering and selling so-called Investment Program Interests to individual clients."

> Schubert directed investors to make their checks payable to her personally or to Schubert and Associates. . . . Schubert did not disclose to investors how she would invest their money, but generally stated that the money would be used to make trades in option contracts, and she promised that the investments were fool proof and would yield thirty percent (30%) annual interest. Schubert's program, however, was a sham. . . . Schubert used new investor money to pay principal and/or profits to investors who had previously invested.

*Id.* at 1177-78 (quotations and citations omitted). The Tenth Circuit concluded this was a Ponzi scheme, relying on the *Black's Law Dictionary* definition.

<u>Summary and Definition of "Ponzi scheme"</u>

Courts around the country have defined a Ponzi scheme in various ways. Even within the Tenth Circuit, several definitions and descriptions are used. Yet, all of the definitions and descriptions have a common base: a Ponzi scheme is a fraudulent investment scheme in which "returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments." *In re Independent Clearing House Co.*, 41 B.R. at 994 n.12.

In order to show that an investment scheme falls within the definition of a Ponzi scheme, the Receiver must prove by a preponderance of the evidence the *sine qua non* of a Ponzi scheme: that returns to earlier investors were paid by funds from later investors. *See American Cancer Society v. Cook*, 675 F.3d 524 (5th Cir. 2012).

It is also important that the Receiver shows that returns to investors could not be paid by the underlying business venture. As described above, numerous Ponzi schemes have involved seemingly legitimate business ventures. *See Boyle v. Gray*, 28 F.2d 7 (1st Cir. 1928) (Ponzi

-38-

scheme involved a fox breeding business); *In re Le-Nature's, Inc.*, 2009 U.S. Dist. LEXIS 85073
(W.D. Penn.) (Ponzi scheme involved a beverage bottling business); *Gillman v. Ponzi Issue*,
2012 Bankr. LEXIS 3763 (Bankr. D. Utah) (Ponzi scheme involved real estate investment
company). However, in all of the cases, whatever underlying business venture existed yielded
insufficient funds to pay for expenses and provide promised returns to investors. On the other
hand, if an investment scheme generates sufficient funds from legitimate sources to pay
investors, it is unlikely that the scheme is a fraudulent Ponzi scheme.

Other factors, though non-essential to the definition of a Ponzi scheme, have been used
by courts to decide if an investment scheme fits into the Ponzi definition. These include the
promise of large returns;[80] the promise of returns with little to no risk;[81] the promise of consistent
returns;[82] the delivery of promised returns to earlier investors to attract new investors;[83] the
general insolvency of the investment scheme from the beginning;[84] the secrecy, exclusivity,
and/or complexity of the investment scheme;[85] and the general stability of the investment
scheme, among other factors. Although the presence or absence of these factors does not
necessity make or break a Ponzi scheme, these factors are typically present in Ponzi schemes.

---

[80] *See United States v. Cook*, 573 F.2d 281, 282 n.3 (5th Cir. 1978).

[81] *See* U.S. Securities and Exchange Commission, *Ponzi Schemes—Frequently Asked Questions*, at http://www.sec.gov/ answers/ponzi.htm (last visited June 18, 2013).

[82] *Id.*

[83] *See Gillman v. Ponzi Issue, 2012 Bankr. LEXIS 3763 (Bankr. D. Utah)*.

[84] *See In re Bernard L. Madoff Investment Securities LLC*, 458 B.R. 87 (Bankr. S.D.N.Y. 2011).

[85] *See e.g. United States v. Rasheed*, 663 F.2d 843 (9th Cir. 1981).

**CONCLUSION**

This is a unique case.  It is by no means a simplistic duplicate of Charles Ponzi's scheme of borrowing money for a short term from a multitude of persons based on promised high interest rates (sometimes as high as fifty percent), backed by no assets, with only his self-promoted rumors of success in arbitrage in foreign postal stamps. Ponzi's scheme was assetless from the beginning and destined for inevitable failure when new money could not meet ever-expanding new promises and existing obligations. Nor is it Bernard Madoff's similarly assetless shell.

This case is far more complex. Searching analysis is needed to penetrate the maze of facts and transactions which occurred over many years—beginning, the Receiver asserts, in 1996—and to try to bring some semblance of an ordered picture out of MSI's chaos. Because of the manner in which this receivership is proceeding—dealing with 208 entities, real or pretended, and hundreds of transactions of various kinds over a period of years which may involve some innocent or some culpable participants—it is difficult to characterize all of such transactions as Ponzi-related.  This is of some moment to the intervenor objectors in this particular matter because each is or may be a target for a claw-back action by Receiver, and each is concerned that a blanket finding in this proceeding may subject them to a "presumption of Ponzi fraud" in a present or future claw-back action with attendant shifting burdens of proof.[86]

The purpose of the Receiver's motion is to gain an early overall characterization of a

---

[86] (*See* Tr. at 558 ("That is in particular unfair when it is the entire purpose of this proceeding, the receiver asking the Court to declare that this is a Ponzi scheme, is so that the receiver can use that conclusion in 40 clawback actions filed separately in order to invoke the Ponzi presumption and make it easier to sue people like my clients and the McDermotts and hopefully regain money that they think has been improperly paid.").)

Ponzi scheme in order to take future advantage of the "Ponzi presumption", a pleading benefit in classic Ponzi scheme cases for use by the Receiver in ancillary cases where he seeks disgorgement from early investors or other beneficiaries who may have received payments sourced solely from monies contributed by subsequent investors.

The classic case where a "Ponzi presumption" is available is a fraud from the beginning, no assets other than investor contributions, no legitimate business, commingled investment funds, and preferential transfers to early investors from the contributions of subsequent investors. The effort in such a case is to recover the preferential transfers so that all similarly situated investors may share in the benefit as well as the pain.

In such classic examples, the "Ponzi presumption" provides a receiver with a pleading advantage and shifts the burden of showing legitimacy of the benefits received to the target.

An effort to apply such a "Ponzi presumption" in <u>all</u> securities fraud cases which have some Ponzi scheme characteristics is inappropriate. The Receiver's proposed blanket finding and its contemplated future use is far too simplistic in this context, and may penalize innocent action as far as the objectors are concerned—not for Ponzi-related and inappropriate action on their part, if any, but for the Jacobsons' actions, not their own.

In short, the intervenor objectors have a point. In cases short of the classic Ponzi scheme case, the "Ponzi presumption" is no substitute for proof.

One cannot cloak all of Jacobsons' activities as one grand scheme, however labeled. Jacobson activity seems to flow in waves, often directed by the availability of money from whatever source.  Some money seems to be capable of tracing.  Some is lost in commingling. Some activities seem regular, such as the actual sale of a specific interest in some properties to a

third party not affiliated with a guaranteed five to eight percent return.  Often a bank loan with

pledged security seems to be regular, even though loan proceeds may have been used by the

Jacobsons for purposes other than what they told the bank, such as paying or crediting prior

investors their monthly "return".

The enterprise, as far as Jacobsons' actions are concerned, seems unitary and seems to

ebb and flow, sometimes fish, sometimes fowl, sometimes legitimate, sometimes patently

unlawful.  Often it seems, depending on the time and context, a particular transaction might be

subject to a "Ponzi presumption" which itself may be refutable, and at other times, depending on

the time and context, another particular transaction may not.

As to the Jacobsons, the finding requested by the Receiver is unnecessary because of their

agreements with the SEC and the final consent judgments entered by the Court.  As to

intervening objectors and others who may be subject to claw back, it depends on time, context,

the nature of the specific transactions, and the knowledge of the parties.  Each needs to be

examined on an individual basis.

One need recognize in equity that similar does not mean identical.  Context drives.

Burdensome as it may be, fairness demands individual examination.  Due process does as well.

Presumption is but a tool.  It is not a shortcut or substitute for proof. In the finding of Ponzi

schemes, it is applicable where appropriate and if not, then proof of inappropriate activity on the

part of a target, not the mere affixing of a label by the Receiver, is required.

It seems to me that the "Ponzi presumption", in equity, as to third parties, should be of

limited use—indeed, only in those cases as blatant and as plain as the original Charles Ponzi case

and the more recent Madoff case: assetless and fraudulent from day one.

This is not that case. The Receiver asserts this was a Ponzi scheme from the beginning—claimed to be April 1, 1996—and the intervenor objectors assert this was not a Ponzi scheme at all. In a sense, each is correct. Depending on time, circumstance, and transaction, the Jacobson enterprise has, of course, many Ponzi characteristics which often come and go depending on time, circumstance, money source, and transaction.

Often inappropriate activities by the Jacobsons, such as commingling or self-dealing (or on occasion, conversion or securities violations) have resulted in the Receiver succeeding to and administering substantial identifiable tangible assets, the origin of the funding for which is difficult or impossible to trace.

Like most equitable matters of complexity, the history of MSI and related entities displays characteristics of commercial schizophrenia—a split personality—which compels us in future actions by the Receiver to look at transactions closely, at the specific facts and circumstances of each transaction, free from any alleged, all-embracing presumption, but footed on whether a target of the Receiver's action has received funds or assets knowingly, unfairly, or unlawfully.

For the foregoing reasons, the Receiver's motion—which requests this Court identify the entire MSI enterprise as a Ponzi scheme and determine a start date of April 1, 1996 for the MSI Ponzi scheme—is DENIED.

**SO ORDERED.**

DATED this **22** day of August, 2013.

BY THE COURT:

Bruce S. Jenkins
United States Senior District Judge

-44-