IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION<br><br>      Plaintiff,<br><br>v.<br><br>MANAGEMENT SOLUTIONS, INC., a Texas Corporation; WENDELL A. JACOBSON; ALLEN R. JACOBSON,<br><br>      Defendants.<br><br>(Warner Entities v. Miller—Receiver) | **MEMORANDUM OPINION AND ORDER**<br><br><br>Case No. 2:11-CV-01165-BSJ<br><br>District Judge Bruce S. Jenkins |

   This matter came before the court for evidentiary hearing on April 25, 2014. Doyle Byers, Cory Talbot, and David Broadbent appeared on behalf of the Receiver, Gil Miller. James Gilson and Zachery Shields appeared on behalf of Intervenor Plaintiff Warner Entities. The matter was continued until May 9, 2014, and closing argument occurred May 13, 2014.

   Having considered the parties' briefs, the evidence presented, the arguments of counsel, the relevant law, and the equities in this receivership, the court finds the Warner Entities have not demonstrated their ownership claim by clear and convincing evidence and their claim for a 49.5 percent tenant-in-common interest in the proceeds from the sale of Tetonian Apartments is DENIED.

   This is an equitable determination as part of an equitable receivership, dictated by the circumstances of this particular tenant-in-common claim asserted by the Warner Entities. It does

not limit the Warner Entities' right to assert ownership interests in other properties, if any, or the court's ability to consider them.

## BACKGROUND

On February 14, 2014, John A. Beckstead,[1] as receiver for Defendants Management Solutions, Inc., related companies, Wendell A. Jacobson, Allen R. Jacobson, and others (the "Receiver"), submitted a motion seeking confirmation of the private sale of Stone Brook and Tetonian Apartments property free and clear of liens with valid liens to attach to the proceeds of that sale.[2] On March 3, 2014, Intervening Plaintiffs B.C. Warner Investments, L.C.; Truckpro, L.C.; SLEA 423 L.L.C.; B.C. Warner Revocable Trust; BCW - D.O., L.L.C.; BCW - Maui, L.L.C.; BCW - S.F. L.L.C.; TMB Limited Company; Bart C. Warner; James N. Warner, Jeffrey K. Wetzel, Gerald A. Zmyslo (collectively, "Warner" or the "Warner Entities") filed an opposition to the proposed sale, wherein they claimed a 49.5 percent tenant-in-common interest in Tetonian Apartments.[3]

The proposed sale of Stone Brook and Tetonian Apartments and the objections thereto came before the court on March 12, 2014. After hearing arguments from counsel, the court reserved ruling and continued the hearing until March 18, 2014.[4] At the March 18 hearing, counsel for Receiver asked for additional time to complete depositions and respond to the

---

[1] Gil A. Miller was subsequently substituted as appointed Receiver on April 15, 2014. (*See* Order Substituting Receiver, filed April 15, 2014 (CM/ECF No. 1813).)

[2] (Mot. to Confirm a Private Sale of Stone Brook & Tetonian Properties & to Approve Sale Free & Clear of Liens with Valid Liens to Attach to Proceeds, filed February 14, 2014 (CM/ECF No. 1588).)

[3] (Mem. in Opp'n to Receiver's Mot. to Confirm a Private Sale of Stone Brook and Tetonian Properties, filed March 3, 2014 (CM/ECF No. 1621).)

[4] (*See* Minute Entry for March 12, 2014 hearing, (CM/ECF No. 1723).)

Warner Entities' newest memorandum in opposition to the proposed sale. The court granted the request and subsequently set scheduling and evidentiary hearings for April 23 and April 25, 2014, respectively.[5] On April 10, 2014, the Receiver filed an additional memorandum in support of the proposed sale,[6] which the Warner Entities responded to on April 18, 2014.[7]

At the April 25, 2014 evidentiary hearing, counsel for the Receiver and counsel for the Warner Entities informed the court that the parties had resolved certain of the Warner Entities' concerns and that, as such, the Warner Entities withdrew their objection to the Receiver's proposed sale.[8] In the absence of objections to the proposed sale and based on the arguments of counsel and good cause appearing, the court confirmed the sale with proceeds subject to valid interests, if any.[9] The evidentiary hearing proceeded in order to determine the nature of the Warner Entities' interest in Tetonian Apartments and any resulting attachment to sale proceeds.

---

[5](*See* Am. Notice of Hr'g, filed March 31, 2014 (CM/ECF No. 1761, 1762).)

[6](Supplemental Br. in Supp. of Mot. to Confirm a Private Sale of Stone Brook and Tetonian Properties and to Approve Sale Free and Clear of Liens with Valid Liens to Attach to Proceeds, filed April 10, 2014 (CM/ECF No. 1797).)

[7](Warner's Mem. in Resp. to Receiver's Supplemental Br. Regarding Receiver's Mot. to Confirm Private Sale of Stone Brook and Tetonian Properties, filed April 18, 2014 (CM/ECF No. 1834).)

[8]The withdrawal of the Warner's objection to the proposed sale came in response to an amended purchase and sale agreement between the Receiver and the Barlow Corporation, which provided for an increased purchase price of $12,082,250, with an allocation of $8,524,926 to Tetonian Apartments. (*See* Stipulation in Partial Resolution of Warner's Opp'n to Receiver's Mot. to Confirm a Private Sale of Stone Brook and Tetonian Properties and to Approve Sale Free and Clear of Liens With Valid Liens to Attach to Proceeds, filed April 25, 2014 (CM/ECF No. 1853), at 2.)

[9](*See* Order Confirming a Private Sale of Stone Brook and Tetonian Properties and to Approve Sale Free and Clear of Liens With Valid Liens to Attach to Proceeds, filed May 1, 2014 (CM/ECF No. 1875).)

**BURDEN OF PROOF**

While there is a paucity of express authority as to the quantum of proof required by one seeking recognition of an ownership interest in realty contrary to a public recorded deed, particularly in an equitable receivership with a multiplicity of competing interests, what guidance is available points to clear and convincing as the preferred standard.

For the matter before us, there are two deeds at play. The first is the deed held by the Receiver providing Tetonian Properties, LLC ("Tetonian Properties) with 100 percent title interest in Tetonian Apartments.[10] This deed is recorded.[11] The second is the deed purportedly conveying to Warner a 49.5 percent interest in Tetonian Apartments. That "original deed" is not available. That deed was not recorded.[12] No one has been able to testify as to its physical delivery. Its location is unknown.[13]

Warner is arguing implicitly, in a sense, that the first deed, the Receiver's deed, is not accurate because it does not describe the purported conveyance to Warner. Warner asserts implicitly that the Receiver's deed is inaccurate because it overstates the Receiver's interest. The burden is on Warner to demonstrate the validity of his 49.5 percent interest by clear and convincing evidence: "The recording of a deed raises a presumption of delivery, which presumption is entitled to great and controlling weight and which can only be overcome by clear and convincing evidence." *Controlled Receivables, Inc. v. Harman*, 17 Utah 2d 420, 423, 413

---

[10] The parties on April 25, 2014 provided a proposed order to the court containing stipulations. Because of change of circumstances eliminating some issues, the order was not executed by the court, but the relevant stipulations remain and were used by the parties and considered by the court. For the convenience of the parties, the court has designated the document containing factual stipulations as "Exhibit A."

[11] (*See* Exhibit A, at 9.)

[12] (*Id.*, at 11.)

[13] (*Id.*)

P.2d 807, 809 (1966); *see* 23 Am. Jur. 2d Deeds § 141. "The law presumes that the holder of title to property is the owner thereof; *Hawe v. Hawe*, 89 Idaho 367, 406 P.2d 106 (1965); *Shurrum v. Watts*, 80 Idaho 44, 324 P.2d 380 (1958). The effect of this presumption is that:'(O)ne who would claim the ownership of property of which the legal title stands or [sic] record in another, or that the same is held by such person in trust for the one so claiming, must establish such claim by evidence that is clear, satisfactory and convincing.' *In re Capolino's Estate*, 94 Cal.App.2d 574, 210 P.2d 850 (1949), at 852, quoting *Redsted v. Weiss*, 73 Cal.App.2d 889, 167 P.2d 735 (1946)." *Russ Ballard & Family Achievement Inst. v. Lava Hot Springs Resort, Inc.*, 97 Idaho 572, 579, 548 P.2d 72, 79 (1976).

The original of the second deed was either retained by Tetonian Properties and never delivered, or it was lost. In either case, the burden is on Warner to demonstrate the deed's delivery and acceptance, or its equivalent. *See Krebs v. Krebs*, 114 Idaho 571, 574, 759 P.2d 77, 80 (Ct. App. 1988); 23 Am. Jur. 2d Deeds § 129. As indicated above and outlined in Utah Code Ann. § 57-4a-4 (West), it is a recorded deed that creates presumptions regarding title to the real property affected. There is no contention that the Receiver's deed was not recorded or that Tetonian Properties (and thus Receiver) is record title owner of Tetonian Apartments.[14] And there is no contention that Warner's purported deed was recorded.[15] As such, the validity of the Receiver's deed is entitled to "great and controlling weight." And the burden is on Warner to demonstrate by clear and convincing evidence that the Receiver's deed is incomplete and that Warner's unrecorded deed was created, delivered, and accepted.

---

[14](*Id.*, at 9.)

[15](*Id.*, at 11.)

# DISCUSSION

The Warner Entities argue that in January 2009, SLEA 423, LLC ("SLEA 423") received a valid tenant-in-common interest in 49.5 percent of the Tetonian Apartments real property from Tetonian Properties.[16] The sale of real property requires both delivery and acceptance. *See Estate of Skvorak v. Sec. Union Title Ins. Co.*, 140 Idaho 16, 20-21, 89 P.3d 856, 860-61 (2004) ("From these holdings it appears there cannot be a unilateral transfer of interest in real estate without delivery and delivery requires the mutual assent of the parties."); *Santaquin Min. Co. v. High Roller Min. Co.*, 25 Utah 282, 71 P. 77, 80 (1903) ("There can be no delivery of a deed without acceptance, and no acceptance without the existence of some person or entity with capacity to accept, and when W. H. West received the deed the corporation was not in existence."); 23 Am. Jur. 2d Deeds § 149; 26A C.J.S. Deeds § 90. For the reasons discussed below, the Warner Entities failed to carry the burden of demonstrating by clear and convincing evidence that both occurred.[17]

## A. DELIVERY

The evidence of a physical delivery of an original deed from Tetonian Properties to SLEA 423 is not clear and convincing. But it is possession of this deed that the Warner Entities

---

[16]Tetonian Properties is a related MSI entity and subject to the Order Appointing Receiver, Freezing Assets and Other Relief. (Filed December 15, 2011 (CM/ECF No. 4), at 25).

[17]The rule is one of clear and convincing evidence, but the Warner Entities similarly did not prove delivery or acceptance of a 49.5 percent ownership interest by a preponderance of evidence.

ostensibly acquired by their acquisition of SLEA 423 from Summit Exchange Services, LLC ("Summit").[18]

Jacobson testified that there was an original deed, but he did not know what happened to it. Hr'g 05/09/14 Tr., 18:13-23. Warner, as the successor of SLEA 423 after the requisite waiting period, never saw an original deed. Hr'g 04/25/14 Tr., 98:17-20; 138:14-24. Both Jacobson and James Warner testified that they believed Ray Beck, as manager of Summit, would see that the deed was recorded. Hr'g 05/09/14 Tr., 100:18-25; Hr'g 04/25/14 Tr., 98:21-99:14. But Beck never saw the original deed. Hr'g 04/25/14 Tr., 72:14-17. Beck testified to receiving a copy of the deed, but could not testify specifically where the copy came from. *Id.*, at 83:1-5.[19]

Neither Warner nor the SLEA 423 grantee recall seeing the original deed. The Purchase and Sale Agreement specifically contemplates that "Possession of the Property attributable to the Undivided Interest shall be delivered to Buyer at Closing." Ex. 19, C:5(f). In Bart Warner's deposition, this provision was identified and counsel for Receiver, Doyle Byers, asked Bart Warner whether the buyer did anything to secure possession of the property at closing:

    A.    We assumed it would be delivered to us.
    Q.    How?
    A.    Well, by the title company or the exchanger or Wendell.
    Q.    So "it" - - by "it," do you mean the deed?
    A.    Yeah, or whatever documents we needed for the exchange, the 1031.
    Q.    Okay. Is there anything outside of that that you did to actually take possession of the property?
    A.    Like, what would that be?
    Q.    I don't know. I'm just wondering if you did anything, SLEA did anything.

---

[18]Summit is the 1031 exchange accommodation service used by the Warner Entities to facilitate the 1031 exchange with Tetonian Properties. Ray Beck, a manager of Summit, signed an Assignment and Assumption of Membership Interest on July 10, 2009, transferring Summit's Membership Interest in SLEA 423 to BCW-SF. (*See* Exhibit A, at 7, 13.)

[19]In response to the Court's question as to who sent Beck the deed copy, Beck stated, "I don't know specifically. Someone sent me. I would suspect it was in the Jacobson origin." (Hr'g 04/25/14 Tr., 83:4-5.)

>           MR. GILSON: Did you go get a pickup truck and dig up the soil?
> Q.      (By Mr. Byers) Or, you know, there were no keys exchanged, or anything like that - -
> A.      I wasn't moving in.
> Q.      - - for you to actually take possession? I understand that, but it contemplates it, so I'm just asking if you did anything.
> A.      No.

Bart Cannon Warner Dep., (CM/ECF No. 1800-6), at 118:1-119:5.

The assumption by Warner or Jacobson that Beck would have received and recorded the original deed seems erroneous, given that Beck testified he could not recall instructing anyone to record the deed, not for the present transaction or for previous transactions involving Warner wherein BCW-SF obtained and sold its interest in Sycamore. Hr'g 04/25/14 Tr., 73:25-74:6.

Without evidence of physical delivery of the original deed, the Warner Entities rely on Jacobson's intent to effectuate delivery of the original deed—a symbolic delivery. There is some evidence to support this position. Jacobson testified that his intent in signing the deed was to convey a 49.5 percent ownership interest. Hr'g 05/09/14 Tr., 21:2-7. Additionally, Bart Warner through Summit made a down payment and construction draws to Tetonian Properties between January 22 and July 7, 2009, totaling $962,920.63.[20]

There are also annual Form 8825 tax statements from 2009-2012 that Tetonian Properties provided Bart Warner, attributing 49.5 percent of the property income and expenses to him. *See* Ex. 41. However, Tetonian Properties identifies Bart Warner as the 49.5 percent owner. But it is SLEA 423, not Bart Warner, which is the purported grantee of the ownership interest. There is no evidence in the record of a real property conveyance to Warner by SLEA 423.

---

[20](Exhibit A, at 12.)

Troubling inconsistencies in Jacobson's behavior contrary to Jacobson's "intent" testimony are not limited to tax statements. More problematic are the representations Jacobson made to lenders after the purported transfer to Warner. Approximately April 2009, Tetonian Properties obtained a hard money loan from Northstar Funding. Hr'g 05/09/14 Tr., 13:3-15. In August 2009, it was refinanced through a $4 million loan from America First Credit Union. *Id.*, at 13:16-14:1. That loan in turn was refinanced in January 2011 with a loan of over $6 million from Key Bank. *Id.*, at 14:2-12. For each loan and the loan documents involved, Jacobson did not reveal to the lender the existence of a tenant-in-common interest in Tetonian Apartments, let alone an interest held by the Warner Entities. In the trust deed between borrower Tetonian Properties and lender Northstar Funding, the legal description states, "Borrower covenants that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record." Ex. 74; Hr'g 05/09/14 Tr., 74:13-75:25. In his deposition, Jacobson testified he did not think he notified Northstar Funding that he had conveyed half the property to Warner Entities, neither could he remember notifying the existing members of Tetonian Properties. Wendell A. Jacobson Dep., (CM/ECF No. 1799-2), at 136:18-137:4.

Similarly, the America First Credit Union loan, which replaced Northstar Funding, states in the Construction Loan Deed of Trust, Assignment of Rents and Leases, Security Agreement, and Fixture Filing that Tetonian Properties, the grantor, "is or is about to become the owner of fee simple title." Exhibit 31; *see also*, Hr'g 05/09/14 Tr., 76:13-77:22. Jacobson testified to having no recollection of ever affirmatively disclosing to America First Credit Union that

Tetonian Properties was not the sole owner. Wendell A. Jacobson Dep., (CM/ECF No. 1799-2), at 214:11-19.

With the subsequent Key Bank loan, the pattern continued. Its loan documents do not reflect any ownership interest by Bart Warner or any of his companies, but reflect Tetonian Properties as owner in fee simple. Hr'g 05/09/24 Tr., 77:23-79:25.[21] Jacobson testified that he thought Key Bank likely knew the Warner Entities owned a tenant-in-common interest, given the tax returns, balance sheets and other documents the bank had access to which indicated a tenant-in-common interest. *Id.*, at 79:3-16. But, again, Jacobson testified that he did not recall ever expressly disclosing to Key Bank that Tetonian Properties did not own the Tetonian Apartments in fee simple. Wendell Jacobson Dep., (CM/ECF No. 1799-2), at 248:17-23. And he stated just the opposite in the loan documents.

Shortly before the Key Bank loan, Wendell Jacobson's brother, Gene Jacobson, prepared a portfolio summary for Tetonian Properties "in an effort to acquire long term financing for the newly constructed Stonebrook Apartments—Phase II and its owner, Tetonian Properties, LLC." Ex. 35. This portfolio summary makes no indication that there is any other ownership interest, other than Tetonian Properties, in Tetonian Apartments, and Jacobson testified that it was probably sent to potential lenders to obtain financing.[22]

Jacobson suggested these representations to lenders may have been mistakes or oversights. Hr'g 05/09/14 Tr., at 75:21-25; 76:22-77:7. But Jacobson is a sophisticated

---

[21](*See also id.*, at 15.)

[22](*Id.*)

businessman, a repeat player in real estate transactions.[23] It is unlikely that he would mistakenly state Tetonian Properties held the property in fee simple if it did not.

The effect of these loan documents, and not just the statements made therein, belie an intent to convey 49.5 percent of Tetonian Apartments to the Warner Entities. These loans did not just encumber Tetonian Properties' alleged remaining 50.5 percent interest in Tetonian Apartments. They encumbered the property in its entirety, long after the purported conveyance of an interest to a Warner entity and consistent with the non-delivery of an original deed by a sophisticated businessman.[24]

Jacobson's treatment of investors is also inconsistent with an intent to convey ownership interest to the Warner Entities. Jacobson did not just use borrowed money and Warner money for Tetonian Properties—before and after the Warner alleged purchase, Jacobson solicited approximately $5.5 million in investor funds. Hr'g 05/09/14 Tr., 56:17-57:7. These funds contributed to the acquisition and construction of the property. *Id.*, at 57:10-11. This $5.5 million commingled investor money was funneled through Thunder Bay. *Id.*, at 61:5-17. If Jacobson intended to symbolically deliver an ownership interest to the Warner Entities and believed he had done so, one would expect him to communicate this fact to subsequent investors in Tetonian Properties. But Jacobson testified in his deposition that he could not recall ever making such communications. CM/ECF No. 1799-2, at 139:3-15.[25] The declaration of investor

---

[23]Jacobson testified that he has been involved in hundreds of real estate transactions. (Hr'g 05/09/14 Tr., 87:19-22.)

[24]Jacobson testified that he believed he had the power to encumber the entire property. (Wendell A. Jacobson Dep., (CM/ECF No. 1799-2), at 233:1-234:7.) But no such agreement between him and Warner was memorialized in writing. (Hr'g 04/25/14 Tr., 140:10-15.)

[25](*See also* Exhibit A, at 17.)

John C. Phillips suggests Jacobson did not do so. Phillips declares that he invested $300,000 in Tetonian Properties in October 2009—months after the purported 49.5 percent ownership transfer to the Warner Entities—after (i) communicating to Jacobson that he did not want to invest in a company that held property that had been involved in 1031 exchanges or that had sold tenant-in-common interests in the property, and (ii) Jacobson never telling him that the property owned by Tetonian Properties had been involved in 1031 exchanges and had sold tenant-in-common interests. CM/ECF No. 1802-7.[26]

For the reasons outlined above, Jacobson's professed intent is conclusively contradicted by Jacobson's subsequent actions. The court finds that a delivery, whether physical or symbolic, is not demonstrated by clear and convincing evidence.

### B. ACCEPTANCE

Assuming an intent to deliver, there is not clear and convincing evidence that such symbolic delivery was accepted.[27]

Beck, the Summit SLEA 423 manager and SLEA 423's creator, testified that he at no time ever saw the original deed. Hr'g 04/25/14 Tr., 72:14-17. Having never seen it, it was impossible for him to accept it. He saw a copy. *Id.*, at 83:1-5. He was of the understanding that someone else, a closing officer, an escrow agent with whom he had corresponded, would handle

---

[26] Jacobson recalls discussing with Phillips about 1031 exchanges and tenant-in-common interests, but believes that conversation took place after Phillips had invested in Tetonian Properties. (*See* Hr'g 05/09/14 Tr., 27:23-28:10.)

[27] The receipt of a copy of a deed by SLEA 423 is some evidence of the existence of an original deed but, standing alone, is not evidence of the delivery of an original deed to SLEA 423, Warner, or an escrow agent or closing officer.

12

the receipt and recording of the original deed. *Id.*, at 83:23-84:16; 86:4-16; Ray Beck Dep., (CM/ECF No. 1802-1), at 86:5-20. That did not happen. The original deed was never recorded.[28] There was no testimony offered from a closing officer or escrow agent as to the physical receipt, acceptance, or attempt to record such a deed.

And looking at the loan or loans purportedly existing at the time of transfer and the loans subsequent to the transfer, it does not appear Beck or Warner symbolically accepted delivery either.

The sales price for the property interest was $1.5 million—$366,000 in cash and $1.134 million in existing note, either to be assumed or for the interest to be subject to. Hr'g 04/25/14 Tr., 47:8-48:12.[29] Beck oversaw the original payment of $366,000 to Tetonian Properties as well as "construction draws" over a period of time amounting to $596,920.63 to comply with 1031 regulations and to insulate the total from the reach of taxing authorities.[30] But neither Beck nor Warner seem to know anything about this purportedly existing note, nor did they act to undertake it. Beck testified he was never provided with the note. *Id.*, at 48:24-49:4. He did not know who the payee on the note was. *Id.*, at 65:24-66:1; 80:13-18. Beck testified that he did not sign an existing note and did not engage in a formal assumption of a note. *Id.*, at 79:10-25. Additionally, Beck was not involved in coming up with the $1.5 million purchase price. *Id.*, at 71:11-13. The total debt of the existing note as of the closing date, according to the Purchase and Sale

---

[28] (Exhibit A, at 11.)

[29] The Summary of Terms (Ex. 15) describes the purchase price as including "$1,134,000.00 Existing Note (to be assumed)." In contrast, the Purchase and Sale Agreement (Ex. 19), which was the document signed, states that the buyer will take their interest "subject to that certain blanket loan."

[30] (Exhibit A, at 12.)

Agreement, was $2,268,000. *Id.*, at 85:10-13. But Beck was not entirely sure where that figure came from—he believed it was generated by Jacobson. *Id.*, at 85:13-18.

Similarly, the Warner Entities were ignorant of the details of any existing note and did nothing in the way of putting their name on it. James Warner stated that he believed there was debt on the property at the time of the property transfer, but he did not know to whom the debt was owed. *Id.*, at 123:8-12. Bart Warner testified in his deposition that he did not recall taking any steps to assume a portion of the loan; he did not know how the Jacobsons serviced the debt subsequent to Warner taking a property interest; and that he assumed Jacobson would take the money he invested and make payments. Bart Cannon Warner Dep., (CM/ECF No. 1800-6), at 102:16-103:13.

It is apparent that a debt existing on the property prior to the 49.5 percent ownership transfer was important for optimizing the tax benefits of a 1031 exchange. Hr'g 04/25/14 Tr., 69:6-70:23; 71:8-21; 103:19-104:7. But neither the existence of such a debt, nor Beck or the Warner's undertaking of it is clear. The absence of either is inconsistent with an acceptance of ownership interest. That part of the transaction seems incomplete.

The Warner Entities' actions, much like Jacobson's actions, are also inconsistent with acceptance and ownership. Warner knew Jacobson was obtaining loans that encumbered the entire property, including their purported interest. Hr'g 04/25/14 Tr., 118:14-20; 139:19-24. In fact, Jacobson suggested that Bart Warner himself referred Jacobson to America First Credit Union and Key Bank. Hr'g 05/09/14 Tr., 91:5-92:8. But the Warner Entities never signed their name to the underlying loan or security documents. Hr'g 05/09/14 Tr., 92:24-93:3. And the Warner Entities never signed their name to a paper authorizing Jacobson to encumber the entire

property. Hr'g 04/25/14 Tr., 140:10-15. Ordinarily, when sophisticated owners of realty have accepted an interest and know that someone is going to borrow against that interest, they want to be part of that transaction where the borrowing occurs because it is their interest being pledged. Sophisticated people do not sit on their hands. They put their names on the signature line, because it is their property being encumbered.

Thus, other than in tax reports, Tetonian Properties through Jacobson, and Warner as successor to the ownership of SLEA 423, acted as if nothing of consequence had changed after the purported 49.5 percent transfer. Each persisted in treating the realty as if it continued to be wholly owned by Tetonian Properties. Warner sat by and allowed the realty to be mortgaged three separate times with neither a complaint, nor an outcry, nor a written undertaking to pay part of the mortgage with the lending institutions. Nor was there a public indication by him or by Jacobson of his asserted interest, even though it appears "investors" were being solicited by Jacobson for membership in Tetonian Properties.[31] Investor money seems to have been used to help build the structure and other improvements in which Warner now claims a superior ownership interest.

Therefore, even if symbolic delivery of the deed did occur, the Warner Entities fail to show by clear and convincing evidence that acceptance also occurred.

---

[31]The fact that the prior Receiver adopted the books for tax reports does not repeal the history of action and inaction on the part of the parties. (*See* Hr'g 04/25/14 Tr., 109:15-110:6.)

## CONCLUSION

Both delivery and acceptance, symbolically or otherwise, fail the test of proof by clear and convincing evidence. The equities relating to competing investor interests fortify that decision. Thus, a 49.5 percent tenant-in-common interest in the proceeds from the sale of Tetonian Apartments is DENIED.

This is an equitable proceeding. SLEA 423 or its legitimate successor is entitled to file a general claim in the proceedings, the amount of which remains for subsequent determination.

DATED this 19th day of June, 2014.

Bruce S. Jenkins
United States District Judge