FILED
2014 NOV 13 PM 2:09
CLERK
U.S. DISTRICT
COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION<br><br>         Plaintiff,<br><br>v.<br><br>MANAGEMENT SOLUTIONS, INC., a Texas Corporation; WENDELL A. JACOBSON; ALLEN R. JACOBSON,<br><br>         Defendants. | **MEMORANDUM OPINION AND ORDER** |
| BOYD SUMMERHAYS, LC; GARY C. WILLIAMSON, and FOUNTAIN GREEN, L.L.C.,<br><br>         Intervenor Plaintiffs,<br><br>vs.<br><br>GIL A. MILLER, Receiver; and COUNCIL PROPERTIES, LLC.<br><br>         Intervenor Defendants. | Case No. 2:11-CV-01165-BSJ<br><br>District Judge Bruce S. Jenkins |

This matter came before the court for a bench trial on July 14 and July 15, 2014. Cory Talbot, Doyle Byers, and Steven Lau appeared on behalf of the Receiver. Stephen Quesenberry and Jessica Anderson appeared on behalf of Intervenor Plaintiffs.

Having considered the parties' briefs, the evidence presented, the arguments of counsel, the relevant law, and the equities in this receivership, the court finds the Intervenor Plaintiffs

have not demonstrated their equitable entitlement to ownership interest in the Madison Chase property. Intervenor Plaintiffs' claim is therefore DENIED.

This is an equitable determination as part of an equitable receivership, dictated by the circumstances of these particular ownership claims asserted by Intervenor Plaintiffs. It does not limit Intervenor Plaintiffs' right to assert ownership interests in other properties, if any, to file claims, or the court's ability to consider them.

## BACKGROUND

On November 8, 2013, Boyd Summerhays, LC; Gary C. Williamson; and Fountain Green, L.L.C., ("Intervenor Plaintiffs") filed a motion to intervene in reference to the Madison Chase property.[1] John Beckstead,[2] as appointed receiver of Management Solutions Inc. ("MSI") and other entities, did not oppose the proposed intervention.[3] The court subsequently granted the motion to intervene.[4]

Thereafter, Intervenor Plaintiffs filed a Complaint against John Beckstead and Council Properties, LLC ("Council Properties"), a MSI related entity.[5] The Complaint sought declaratory judgment that (i) Boyd Summerhays, LC holds a 37.12 percent fee simple interest as a tenant in common in the Madison Chase property; (ii) Gary Williamson holds a 12.375 percent fee simple interest as a tenant in common in the Madison Chase property; and (iii) Fountain Green, L.L.C.

---

[1] (Mot. to Intervene Re: Madison Chase Apartments, filed Nov. 8, 2013 (CM/ECF No. 1373).)

[2] Gil A. Miller was subsequently substituted as appointed Receiver on April 15, 2014. (*See* Order Substituting Receiver, filed Apr. 15, 2014 (CM/ECF No. 1813).)

[3] (Notice of Non-Opp'n to Mot. to Intervene Re: Madison Chase Apartments, filed Nov. 27, 2013 (CM/ECF No. 1426).)

[4] (Order Granting Mot. to Intervene Re: Madison Chase Apartments, filed Dec. 4, 2013 (CM/ECF No. 1444).)

[5] (Compl., filed Dec. 9, 2013 (CM/ECF No. 1475).)

holds a 49.5 percent fee simple interest as a tenant in common in the Madison Chase property.[6]
Additionally, the Complaint sought a court order stating Intervenor Plaintiffs are entitled to an
immediate accounting from the Receiver, to receive a proportionate share of rents, and to secure
management of the property as majority owners.[7]

The Receiver responded to the Complaint on December 17, 2013, requesting the court
deny Intervenor Plaintiffs' request for relief.[8] After a final pretrial conference,[9] trial briefs filed
by Intervenor Plaintiffs[10] and the Receiver,[11] and a hearing to consider parties' proposed pretrial
order,[12] the court held a bench trial on July 14 and July 15, 2014. At the end of closing
arguments on July 15, the court requested counsel for Intervenor Plaintiffs to draft, within ten
days, a short memorandum discussing how to reconcile the periodic payments Intervenor
Plaintiffs received with the notion of property ownership. Hr'g 07/15/14 Tr., at 150:7-22. The
court asked the Receiver to respond to that memorandum within ten days after its filing. *Id.*

Intervenor Plaintiffs filed their post-trial brief on July 25, 2014.[13] After the court
provided an extension of time to file a response,[14] Receiver filed his post-trial brief on August 6,
2014,[15] which Intervenor Plaintiffs replied to on August 8, 2014.[16]

---

[6] (*Id.*)

[7] (*Id.*)

[8] (Answer to Compl., filed Dec. 17, 2013 (CM/ECF 1497).)

[9] (Minute Entry for May 8, 2014 Hr'g, (CM/ECF No. 1882).)

[10] (Intervenor Pls.' Trial Br., filed July 10, 2014 (CM/ECF No. 1995).)

[11] (Trial Br. Regarding Madison Chase, filed July 14, 2014 (CM/ECF No. 1997).)

[12] (Minute Entry for July 11, 2014 Hr'g (CM/ECF No. 1996).)

[13] (Intervenor Pls.' Post-Trial Br., filed July 25, 2014 (CM/ECF No. 2016).)

The matter came before the court for further argument on September 19, 2014, after which, the court reserving ruling on the matter.[17]

## APPLICABLE LAW

The parties contest whether the relevant state law is Texas or Utah law. Each of the purchase and sale agreements related to Intervenor Plaintiffs' purported ownership interests in the Madison Chase property contains the following provision:

> 9. Governing Law. This Agreement and all other purchase and sale documents shall be governed by and interpreted in accordance with the laws of the State of Utah.

Ex. 4, p. 3, ¶ 9; Ex. 5, p. 3, ¶ 9; Ex. 13, p. 3, ¶ 9; Ex. 26, p. 3, ¶ 9.

Intervenor Plaintiffs argue Texas law governs. They cite two Restatement (Second) of Conflict of Laws provisions.[18] First, they cite § 223 (1971):

> (1) Whether a conveyance transfers an interest in land and the nature of the interest transferred are determined by the law that would be applied by the courts of the situs.

> (2) These courts would usually apply their own local law in determining such questions.

Second, they cite to § 226 (1971):

> (1) Whether there has been a transfer of an interest in land by operation of law and the nature of the interest transferred are determined by the law that would be applied by the courts of the situs.

---

[14](Order Granting Req. to Extend Deadline to Respond to Intervenors' Post-Trial Br., filed Aug. 1, 2014 (CM/ECF No. 2042).)

[15](Resp. to Intervenor Pls.' Post-Trial Br., filed Aug. 6, 2014 (CM/ECF No. 2045).)

[16](Reply to Resp. to Intervenor Pls.' Post-Trial Br., filed Aug. 8, 2014 (CM/ECF No. 2052).)

[17](Minute Entry for Sept. 19, 2014 Hr'g (CM/ECF No. 2130).)

[18](Intervenor Pls.' Trial Br., filed July 10, 2014 (CM/ECF No. 1995), at 3-4.)

> (2) These courts would usually apply their own local law in determining such questions.

Thus, Intervenor Plaintiffs argue, because the property at issue is in Texas, the applicable law is the law that Texas courts would apply.[19] And, quoting *Haga v. Thomas*, Intervenor Plaintiffs contend that Texas courts apply Texas law to dispositions of property located in Texas:

> Texas courts have "ultimate power over lands situated within [this] state." *Toledo Soc'y for Crippled Children v. Hickok*, 152 Tex. 578, 261 S.W.2d 692, 696 (1953); *Colden v. Alexander*, 141 Tex. 134, 171 S.W.2d 328, 335 (1943) ("It is the settled law of this State, as well as the law generally, that the title to real property is exclusively subject to the government within whose territory it is situated.").

409 S.W.3d 731, 736 (Tex. App. 2013).[20]

Intervenor Plaintiffs acknowledge the purchase and sale agreement provision calling for Utah law, but they argue that the provision is extraneous because "[n]either the terms of the agreement nor the terms of other sale documents, however, are at issue in this case."[21] No party is suing for breach of a purchase and sale agreement. Instead, "[t]he central and underlying issue here is the ownership of and title to a parcel of real property located in the State of Texas. No other law but Texas law can apply."[22]

---

[19](*Id.*, at 2-3.)

[20](*Id.*)

[21](*Id.*, at 4.)

[22](*Id.*, at 5; *see also* Hr'g 07/15/14 Tr., 105:18-106:2.) Note: in their trial brief, Intervenor Plaintiffs' cite *Brown v. Davila*, 807 S.W.2d 12 (Tex. App. 1991) to support their position that the "Governing Law" provisions of the purchase and sale agreements are inapplicable to the considerations of title to the Madison Chase property. (*See* Intervenor Pls.' Trial Br., filed July 10, 2014 (CM/ECF No. 1995), at 4-5.) Intervenor Plaintiffs misconstrue *Brown*, whose facts greatly differ from those presently before the court, and the case is unhelpful in determining whether Utah or Texas law applies.

In contrast, the Receiver argues Utah law governs. The Receiver contends that this court sits in Utah, requiring Utah choice of law rules to apply.[23] And, according to the Receiver, under Utah law, when parties have chosen the law to cover their contractual rights and duties, that chosen law will be applied.[24] The Receiver similarly cites to Restatement (Second) of Conflict of Laws, but instead relies on § 189:

> The validity of a contract for the transfer of an interest in land and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the land is situated unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

The Receiver argues "[t]he 'right created' by 'a contract for the transfer of an interest in land' are determined by the law of the situs, as Intervenors claims—but only 'in the absence of an effective choice of law by the parties.'"[25] And, the Receiver argues, the contracts' choice of law provisions govern because Intervenor Plaintiffs' claims rely on the existence and performance of such agreements.[26] The Receiver asserts that Intervenor Plaintiffs "cannot claim that their right to equitable title arises by virtue of the contract and then ignore its choice of law provisions."[27]

The court notes an important distinction made in the comments of Restatement (Second) of Conflict of Laws § 189 (1971), the section to which the Receiver cites:

---

[23](Trial Br. Regarding Madison Chase, filed July 14, 2014 (CM/ECF No. 1997), at 2.)

[24](*Id.*)

[25](*Id.*, at 3.)

[26](*Id.*)

[27](*Id.*, at 3-4.)

> *a. Distinction between contract and transfer.* A distinction must be drawn between a contract for the transfer of an interest in land and the actual transfer of such an interest. The validity of a contract for the transfer of an interest in land, and the rights created thereby, are determined by the local law of the state selected by application of the rule of the Section. On the other hand, whether the contract operates as an actual transfer of an interest in the land depends upon the laws selected by application of the rule of § 223. A contract to transfer an interest in land may be valid as a contract but inoperative as a transfer, or, in the alternative, it may be invalid as a contract but operative as a transfer.

As previously noted, § 223 states that whether an agreement transfers a land interest is determined by the law that would be applied by the courts of the situs—here, Texas—and that such courts would usually apply their own local law.

Section 223 is applicable in the present case. The parties stipulate that Intervenor Plaintiffs entered into purchase agreements for the Madison Chase property.[28] The parties agree Boyd Summerhays, LC; Gary Williamson; and Fountain Green, L.C. entered into agreements to purchase 37.12 percent, 12.375 percent, and 49.5 percent interests in the Madison Chase property, respectively.[29] However, a stipulation as to the *existence* of agreements is not a stipulation as to the *implications* of those agreements. The question remains whether those agreements operate as an actual transfer of an interest in the Madison Chase property. Thus, looking to § 223, we must determine what law Texas courts would apply in light of the "Governing Law" provisions.[30]

---

[28]The parties on July 14, 2014 provided a proposed revised pretrial order to the court containing stipulations. The court has not executed the proposed order, but the relevant stipulations remain and were used by the parties and considered by the court. For the convenience of the parties, the court has designated the document containing factual stipulations as "Exhibit A."

[29](*See* Exhibit A, at 11, 13, 15.)

[30]This strategy is further supported by 12A Tex. Jur. 3d Conflict of Laws § 20.

7

This court finds Texas courts would apply Texas law. In addition to the case Intervenor

Plaintiffs cite, *Haga v. Thomas*, the court also notes *Pellow v. Cade*:

> Section 223 of the Restatement states that "[w]hether a conveyance
> transfers an interest in land and the nature of the interest
> transferred are determined by the law that would be applied by the
> courts of the situs." restatement (Second) of Conflict of Laws §
> 223 (1971). In determining which law to apply, the court must look
> to where the dominant interest lies. **Because the issue here
> involves the alienation of real property located in Texas, the
> situs has the dominant interest, and Texas law should be
> applied.** *See* restatement (Second) of Conflict of Laws § 223 cmt.
> b (1971). Questions concerning title to real estate, the validity of
> conveyances, warranties, and foreclosures are determined by the
> law of the situs. *Colden v. Alexander,* 141 Tex. 134, 171 S.W.2d
> 328 (1943).

990 S.W.2d 307, 314 (Tex. App.--Texarkana 1999) (emphasis added).[31] In the present case,

Texas similarly has the dominant interest in questions concerning title to real property in its state.

The "Governing Law" provisions identifying Utah as applicable law do not alter this

conclusion. Texas courts recognize that "not all claims in a case are necessarily governed by a

choice-of-law provision that expressly governs only contractual matters." *See Fairmont Supply

Co. v. Hooks Indus., Inc.,* 177 S.W.3d 529, 534-35 (Tex. App.—Houston [1st Dis.] 2005) (citing

*Stier v. Reading & Bates Corp.,* 992 S.W.2d 423, 433 (Tex. 1999); *Covert Chevrolet–

Oldsmobile, Inc. v. Gen. Motors Corp.*, No. 05–00–01170–CV, 2001 WL 950274, at *2–3

(Tex.App.-Dallas Aug.21, 2001, no pet.); *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d

---

[31]*See also Turner v. Mullins*, 162 S.W.3d 356, 366 (Tex. App.-Fort Worth 2005) ("In determining the
ownership of property, we apply the law of the jurisdiction in which the land is located. See *Colden v. Alexander*,
141 Tex. 134, 171 S.W.2d 328, 335–36 (1943) (indicating that title to realty can be affected only by the law of the
jurisdiction in which it is situated); *Toledo Soc. for Crippled Children v. Hickok*, 152 Tex. 578, 261 S.W.2d 692,
696 (1953) (indicating that the validity of an instrument conveying realty is determined by the laws of the
jurisdiction in which it is located). Thus, in deciding who owns the Disputed Land today, we must apply Texas
law.")

719, 726–27 (5th Cir.2003)); *see also Midwest Med. Supply Co. v. Wingert,* 317 S.W.3d 530,

536-37 (Tex. App.—Dallas 2010).

      Here, the specific choice-of-law provision involved is narrow in scope. To reiterate, it

states as follows:

> 9. Governing Law. This Agreement and all other purchase and sale
> documents shall be governed by and interpreted in accordance with
> the laws of the State of Utah.

Ex. 4, p. 3, ¶ 9; Ex. 5, p. 3, ¶ 9; Ex. 13, p. 3, ¶ 9; Ex. 26, p. 3, ¶ 9.

      The question before the court is not whether purchase agreements regarding the Madison

Chase property exist. Instead, the court must determine whether the agreements operate as an

actual transfer of ownership interest. This question is outside of the "Governing Law" provision.

This conclusion is supported by the fact that the parties could not have contractually agreed that

the agreement resulted in an actual, legitimate transfer of an interest in the land to be recognized

by this court. *C.f. Fairmont Supply Co.*, 177 S.W.3d at 536 (wherein the court found its

conclusion—that the issue of attorney's fees was governed by the law identified in the

underlying contract's choice-of-law provision—was supported by the fact that the parties could

have contractually allocated attorney's fees, if they had so chosen).

      Thus, the court finds that Texas law governs.[32] In this case, that is the principle of

equitable title. Intervenor Plaintiffs do not assert a right to the Madison Chase property through

their receipt of a delivered deed.[33] Intervenor Plaintiffs argue they each hold an equitable

---

[32] As the court finds Intervenor Plaintiffs do not have equitable title in the Madison Chase property,
application of Utah law (under which the basis of Intervenor Plaintiffs' claims—Texas's legal principle of equitable
title—would be inapplicable) would not change the outcome of the case.

[33] Hr'g 07/11/14 Tr., at 48:8-11; Hr'g 07/14/14 Tr., at 6:18-23

ownership interest in the Madison Chase property.[34] "Equitable title is defined as 'a right, enforceable in equity to have the legal title to real estate transferred to the owner of the right upon the performance of specific conditions.'" *Glenn v. Lucas*, 376 S.W.3d 268, 276 (Tex.App.—Texarkana 2012) (quoting *City of Houston v. Guthrie,* 332 S.W.3d 578, 588 (Tex.App.-Houston [1st Dist.] 2009, pet. denied)). "Equitable title may be shown when the plaintiff proves that he has paid the purchase price and fully performed the obligations under the contract." *White v. Hughs*, 867 S.W.2d 846, 849 (Tex.App.—Texarkana 1993). "Upon full performance, the buyer's equitable right ripens into an equitable title superior to legal title to the property." *Gaona v. Gonzales*, 997 S.W.2d 784, 787 (Tex.App.—Austin 1999). As equitable title arises by operation of law, it does not depend on the execution of a deed and the title is not subject to recording. *Id.*

## **BURDEN OF PROOF**

Intervenor Plaintiffs must demonstrate their ownership interest in the Madison Chase property by clear and convincing evidence.

There is a paucity of express authority as to the quantum of proof required by one seeking recognition of an ownership interest in realty contrary to a public recorded deed, particularly in an equitable receivership with a multiplicity of competing interests. Although Intervenor Plaintiffs and the Receiver both offered several cases to support their contrary positions, neither side offered a case directly on point. However, available guidance points the court to clear and convincing, rather than preponderance of evidence, as the appropriate burden of proof.

---

[34]Hr'g 07/11/14 Tr., at 48:10-20.

In support of its position that the appropriate standard is preponderance of evidence, Intervenor Plaintiffs look to trespass to try title cases. In trespass to try title actions, Texas courts have held "[i]t is the plaintiff's burden to establish superior title in itself by a preponderance of the evidence." *United Sav. Ass'n of Texas v. Villanueva*, 878 S.W.2d 619, 622 (Tex.App.— Corpus Christi 1994) (citing *Wells v. Kansas Univ. Endowment Assoc.,* 825 S.W.2d 483, 486 (Tex.App.—Houston [1st Dis.] 1992, writ denied); *see Omohundro v. Jackson*, 36 S.W.3d 677, 680 (Tex.App.—El Paso 2001).

However, these cases do not address the question at hand: the quantum of proof that must be met by one asserting equitable title in realty contrary to current record title. The action of trespass to try title is statutory—it accords a legal remedy, as opposed to an equitable remedy. *Standard Oil Co. of Tex. v. Marshall*, 265 F.2d 46, 50 (5th Cir. 1959); *Katz v. Rodriguez*, 563 S.W.2d 627, 629 (Tex. Civ. App. 1977), writ refused NRE (May 24, 1978); 5A Tex. Prac., Land Titles And Title Examination § 42.4 (3d ed.). And while, as Intervenor Plaintiffs argue in their citation to *Standley v. Sansom*, 367 S.W.3d 343, 348 (Tex. App. 2012), Texas courts may only deviate from the preponderance of the evidence standard in extraordinary circumstances,[35] the present case before the court is no ordinary civil action. Instead, it is an equitable determination as part of an equitable receivership. There are a multitude of competing equities that the court must consider.

The parties stipulate that the following are the current record title owners of the Madison Chase Apartments in Childress, Texas:[36]

---

[35](*See* Intervenor Pls.' Trial Br., filed July 10, 2014 (CM/ECF No. 1995), at 7-8.)

[36](Exhibit A, at 17.)

11

- 6.44% - Mountain Olympus Hills, L.C.
- 5.54% - Gordon R. Kimball
- 4.59% - Woods #1, LLC and William L. Woods
- 1.62% - Ward and Lisa Lemons
- 6.53% - Woods #4, LLC and William L. Woods
- 9.57% - Ande Equipment Limited, LP
- 8.25% - Truman F. Clawson
- 6.60% - Selene J. Corbridge and Elyce Jones
- 4.29% - Squaw Springs, Inc.
- Remainder – Council Properties, L.L.C.

Intervenor Plaintiffs implicitly suggest, in a sense, that the recorded ownership interests indicated above do not accurately reflect the true ownership of the Madison Chase property. Disclaiming the argument of delivery of an original deed,[37] Intervenor Plaintiffs instead suggest the recorded ownership interests are inaccurate because they do not describe the purported conveyance of equitable title to Intervenor Plaintiffs.

As such, Intervenor Plaintiffs have the burden of demonstrating the validity of their ownership interest in the Madison Chase property by clear and convincing evidence: "There is a strong presumption in favor of the correctness of a deed or other instrument as written and executed, and this fair and reasonable presumption will prevail, unless the party who alleges that it does not express the truth overcomes the presumption, and shows the contrary by satisfactory evidence which is clear, strong, and convincing." *Carson v. White*, 456 S.W.2d 212, 215 (Tex. Civ. App. 1970), writ refused NRE (Oct. 7, 1970) (quoting *McWhirter v. McWhirter*, 155 N.C. 145, 147, 71 S.W. 59, 60); *see also Davis v. Gayer*, 01-03-00165-CV, 2004 WL 638140 (Tex. App. Apr. 1, 2004); *Metzger v. Rayburn*, 04-99-00060-CV, 2000 WL 963893 (Tex. App. July

---

[37]Hr'g 07/11/14 Tr., at 48:8-11; Hr'g 07/14/14 Tr., at 6:18-23

12, 2000); *Henderson v. Henderson*, 694 S.W.2d 31, 34 (Tex. App. 1985), writ refused NRE (June 5, 1985).

Thus, Intervenor Plaintiffs must show their right to equitable title—i.e., that they fully performed their agreement obligations—to the Madison Chase property by clear and convincing evidence.

## DISCUSSION

Although they have much in common, Intervenor Plaintiffs represent three separate cases heard as one for the convenience of the parties. In acknowledgement of the differing set of agreements and obligations entered into by each of the Intervenor Plaintiffs, the court will outline the relevant facts for each separately. The court will then address the important similarity between the three cases—the receipt of consistent, monthly payments ostensibly from the revenues of the Madison Chase property—and the effect on the question of equitable title.

For the reasons discussed below, each of the Intervenor Plaintiffs failed to carry their burden of demonstrating by clear and convincing evidence that they fully performed their obligations under their respective agreements sufficient for equitable title.[38]

### A. BOYD SUMMERHAYS, LC

The parties stipulated to the following facts:[39]

- In August 2005, using funds from the sale of non-MSI-related real property, Boyd Summerhays, LC executed a 1031 transaction and purchased a 49.5% tenant-in-common interest in Cleburne Terrace for $1,650,000.

---

[38]The rule is one of clear and convincing evidence, but each of the Intervenor Plaintiffs similarly did not prove by a preponderance of evidence their entitlement to equitable title to the Madison Chase property.

[39](Exhibit A, at 11-13.)

- Boyd Summerhays, LC received monthly payments in connection with its investment in Cleburne Terrace.

- In 2007, Boyd Summerhays, LC sold its interest in Cleburne Terrace for $1,800,000.

- In December 2007, Boyd Summerhays, LC used part of the proceeds from the Cleburne Terrace sale to execute another 1031 transaction to purchase a 37.12% tenant-in-common interest in the Madison Chase Apartments in Childress, Texas for $1,500,000.00. Boyd Summerhays, LC used the remaining $300,000 in proceeds from the Cleburne Terrace sale to execute another 1031 transaction to purchase 30 lots in the Falconhead development in Oklahoma.

- Boyd Summerhays, LC entered into an agreement to purchase a 26.59% tenant-in-common interest in Madison Chase from Council Properties, L.L.C.

- Boyd Summerhays, LC entered into an agreement to purchase a 10.53% tenant-in-common interest in Madison Chase from W. Brett and Sara P. Graham.

- On or about October 19, 2007, a closing on the purchase of the 37.12% tenant-in-common interest was held, and Boyd Summerhays, LC paid the $1,500,000.00 purchase price plus its applicable closing costs.

- Boyd Summerhays, LC used funds from the sale of its interest in Cleburne Terrace to purchase its claimed interest in Madison Chase. Those funds were transferred directly from Cleburne Terrace to Absolute Title Insurance Agency. From Absolute Title Insurance Agency, $1,398,530 was transferred to Council Properties, LLC's Zions Bank account, $101,470 appears to have been transferred directly to W. Brett and Sara P. Graham, and $450 was for fees.

- Council Properties, L.L.C. signed a deed dated October 3, 2007 to Boyd Summerhays, LC for the 26.59% tenant-in-common interest in Madison Chase.

- A copy of the deed from Council Properties, L.L.C. to Boyd Summerhays, LC was delivered to Boyd Summerhays, LC but not recorded.

- W. Brett and Sara P. Graham signed a deed dated October 3, 2007 to Boyd Summerhays, LC for the 10.53% tenant-in-common interest in Madison Chase.

- A copy of the deed from W. Brett and Sara P. Graham to Boyd Summerhays, LC was delivered to Boyd Summerhays, LC but not recorded.

- The parties do not know whether the original deed from Council Properties, LLC to Boyd Summerhays, LC was delivered.

- The parties do not know whether the original deed from W. Brett Graham and Sarah P. Graham to Boyd Summerhays, LC was delivered.

- Also on October 3, 2007 Boyd Summerhays, LC and Madison Chase Apartments executed an Interest Payment Side Agreement where Madison Chase Apartments agreed to pay Boyd Summerhays, LC monthly interest payments of $10,000, or approximately 8% annually, on the entire purported $1,500,000 investment in Madison Chase. Between November 2007 and December 2011, Boyd Summerhays, LC received a total of $500,000 in interest payments related to its investment in Madison Chase.

- As a result, Boyd Summerhays, LC received monthly interest payments in connection with its investment in Madison Chase until the appointment of the Receiver.

When questioned at the bench trial, Boyd Summerhays could not recall seeing the Interest Payment Side Agreement (Ex. 77), why he signed it, or how the 8 percent annual percentage rate was set. Hr'g 07/14/14 Tr., at 160:20-161:16. But he agreed that he received monthly payments on the Madison Chase property. *Id.*, at 162:7-13. In reference to his 2011 tax return (Ex. 45), Boyd Summerhays seemed to believe that Wendell Jacobson did not send him

15

1099 tax forms for the funds sent to Boyd Summerhays, LC, but instead sent information on the

Madison Chase property's rents and expenses. Hr'g 07/14/14 Tr., at 155:7-20. This information

was given to Gale Enger, a CPA who prepared Boyd Summerhays, LC's tax returns. *Id.*, at

156:16-25, 157:24-158:24.

## B.  GARY C. WILLIAMSON

Similarly, the parties stipulated as follows regarding Gary C. Williamson:[40]

- September 2007, Gary C. Williamson sold non-MSI-related real property.

- On or about October 16, 2007, Gary C. Williamson entered into a "Purchase and Sale Agreement" to execute a 1031 transaction using the proceeds from his earlier sale of property for the purchase of a 12.375% tenant-in-common interest in the Madison Chase Apartments in Childress, Texas for $500,000.00.

- There are two Purchase and Sale agreements dated October 16, 2007. Under one of the agreements, Council Properties purports to sell a 12.375% interest in Madison Chase to Gary C. Williamson in exchange for $500,000. The Purchase and Sale Agreement between Council Properties and Williamson was signed by both parties.

- Under the other agreement, Council Properties purports to sell a 8.085% interest in Madison Chase to Mr. Williamson and Squaw Springs, LLC ("Squaw Springs") purports to sell an additional 4.29% interest in Madison Chase to Mr. Williamson for a total of 12.375%. The Purchase and Sale Agreement between Council Properties and Squaw Springs (as sellers) and Williamson (as buyer) was signed by Wendell Jacobson for Council Properties and Squaw Springs.

- A closing was held on the purchase of the 12.375% tenant-in-common interest, and Gary C. Williamson paid the

---

[40](Exhibit A, at 13-14.)

$500,000.00 purchase price plus his applicable closing costs.

- A settlement statement dated October 16, 2007 lists Gary Williamson, LC as buyer and Council Properties, LLC and Squaw Springs, LLC as sellers.

- On October 16, 2007, $178,750 from Williamson was deposited in the Squaw Springs, LLC bank account, and $321,250 was deposited in the Council Properties, LLC bank account.

- An unsigned copy of a Warranty Deed exists where Council Properties, LLC purports to convey an 8.085% interest in Madison Chase to Gary C. Williamson.

- An unsigned copy of a Warranty Deed exists where Squaw Springs, LLC purports to convey a 4.29% interest in Madison Chase to Gary C. Williamson.

- No deed reflecting Gary C. Williamson's 12.375% interest in Madison Chase was recorded.

- Between November 2007 and December 2011, Williamson received nearly-monthly payment of $3,333.33 for a total of $166,666.50 in payments from related to [sic] its investment in Madison Chase.

- The parties do not know whether the original deed from Squaw Springs, LLC to Gary C. Williamson was delivered.

- The parties do not know whether the original deed from Council Properties, LLC to Gary C. Williamson was delivered.

Williamson testified that the payments he received on the Madison Chase property reflect

an 8 percent return on the $500,000 he invested into the property. Hr'g 07/15/14 Tr., at 11:7-10.

The monthly amount received never changed, to Williamson's recollection. *Id.*, at 11:20-23. The

percentage was "an arbitrary amount that was determined that the operating cash flow would

17

sustain until the close of each business year when it could be determined whether they would

have to be changed and/or it would be trued up on the - - when the property was sold." *Id.*, at

11:12-16. Wendell and Alan Jacobson represented that the revenue in the property would support

such monthly payments. *Id.*, at 12:17-20. Williamson stated that he did not recall whether there

was ever a written agreement regarding those monthly payments. *Id.*, at 12:23-13:18.

When asked whether he was aware that the monthly payments he received were made up,

at least in part, from funds from other Jacobson affiliated entities, Williamson testified as

follows:

> I was not specifically aware, but part of the attractiveness of this
> investment is that it was with a company that I perceived to be a
> strong company. I had looked at many of their properties in several
> different states as options to purchase, take interests in. And in the
> course of my getting acquainted with those properties, they were
> all performing at a very high level of occupancy. They had good
> strong cash flows. **And it was my understanding that MSI**
> **would stand behind the cash flow whether Madison had a bad**
> **month or bad year and needed support from its parent or not.**
> **I felt that was one of the benefits, that at least that cash flow**
> **distributions would continue.**

Hr'g 07/15/14 Tr., at 14:2-19 (emphasis added).

Subsequently, Cory Talbot and Williamson had the following dialogue:

> Q.    All right. So if then it was your understanding that MSI
>        would stand behind the property and make payments if
>        Madison Chase was unable to do so, it was not based on a
>        contract arrangement, where did that understanding come
>        from? Did you have a conversation with somebody? If so,
>        do you know when? Where?
>
> A.    I had conversations both with Alan and with Wendell about
>        the overall scope of the MSI operation, how it worked, and
>        how and the strength that they had to achieve what they
>        were doing. I also became aware in reviewing with them
>        that their payment record had been flawless and that they

had made the payments that they committed to make over a period of years on their properties.

Q.     Okay. And so this was - - so then based on your conversation with Alan and Wendell Jacobson, and you understood that MSI would stand behind Madison Chase and make monthly payments if the cash flow from Madison Chase was insufficient to do so?

A.     That they could.

Q.     They could?

A.     They could do that.

Q.     And during the time that you had your investment in Madison Chase, as I understand you previously testified you were never aware that that occurred, that MSI had to step in and make payments on behalf of Madison Chase?

A.     Well, their process was seamless so I would not have had any way of perceiving where that money was coming from.

Q.     Okay. So you don't know of any - -

A.     They didn't ever notify me that last month was a bad month and therefore Thunder Bay was contributing to making those payments.

Q.     Okay. And also one more point on that. Then you understood though that in the event that happened, there would at some point be a true up where funds from other entities would I guess be repaid if that - - if such a situation had occurred?

A.     That is correct.

Hr'g 07/15/14 Tr., at 16:1-17:13.

Williamson testified that he accounted for the payments received from the Madison

Chase property as supplemental income and loss from rental real estate. Hr'g 07/14/14 Tr., at

223:19-22. He stated that he received an accounting of revenues and expenses on the property

and that he reported 12.3 percent of that on his tax statements. *Id.*, at 223:5-12. The portions of

Williamson's tax returns accounting for supplemental income and loss from rental real estate

were prepared on his behalf by a tax preparer. *Id.*, at 223:23-224:3.

### C. FOUNTAIN GREEN, L.L.C.

The parties stipulated to the following facts regarding Fountain Green, L.L.C. ("Fountain

Green"):[41]

- In June 2006, using funds from the sale of non-MSI-related real property, Bowler Holdings, L.C., an entity related to Fountain Green, L.C., executed a 1031 transaction and purchased a 29.03% tenant-in-common interest in San Marin Corpus Christi, an MSI property, for $4,500,000.00.

- Bowler Holdings, L.C. received monthly interest payments in connection with its investment in San Marin Corpus Christi.

- The 29.03% interest in San Marin Corpus Christi was transferred from Bowler Holdings, L.C. to Fountain Green, L.C.

- In 2007, Fountain Green, L.C. sold its interest in San Marin Corpus Christi for approximately $4,632,000.

- In September 2007, Fountain Green, L.C. used part of the proceeds from the San Marin Corpus Christi sale to execute another 1031 transaction to purchase a 49.5% tenant-in-common interest in the Madison Chase Apartments in Childress, Texas for $2,200,000.00. Approximately $885,000 of the proceeds were used to execute another 1031 transaction to purchase 200 lots in the Falconhead development in Oklahoma. The remaining approximately $1,547,000 was distributed to Fountain Green, L.C..

- In September 2007, Fountain Green, L.C. entered into a "Purchase and Sale Agreement" with Ande Equipment Limited, LP; Truman F. Clawson; Selene J. Corbridge and

---

[41](Exhibit A, at 14-16.)

Elyce Jones; Ward and Lisa Lemons; Woods #4, LLC and William Woods; Woods #1, LLC and William Woods; Gordon R. Kimball; Mountain Olympus Hills, L.C.; and Council Properties, LLC for the purchase of a 49.5% tenant-in-common interest in Madison Chase.

- The Purchase and Sale Agreement was signed by each of the above parties.

- On or about September 20, 2007, a closing was held on the purchase of the 49.5% tenant-in-common interest, and Fountain Green, L.C. paid the $2,200,000.00 purchase price plus its applicable closing costs.

- Fountain Green used funds from the sale of its interest in San Marin Corpus Christi to purchase its claimed interest in Madison Chase. Fountain Green appears to have sold its interest to a third-party company titled NNN San Marin Apartments, LLC. $35,501 was wired into Council Properties' Zions Bank account from Absolute Title Insurance Agency, $1,958,514 appears to have been transferred directly to nine of the previous TIC owners, and $205,985 was for fees.

- Only a copy of an unexecuted, unsigned, and unrecorded copy of the deed to Fountain Green, L.C., an unnotarized copy of a signature page signed by Ande Equipment Limited, LP, and a copy of a notarized signature page signed by Elyce Jones have been located.

- No deed reflecting Fountain Green, L.C.'s 49.5% interest in Madison Chase was recorded.

- Between November 2007 and December 2011, Fountain Green, L.C. received nearly-monthly payments of $13,333.33 for a total of $666,666.50 in payments related to its investment in Madison Chase.

Randy Bowler and his wife are the owners of Fountain Green, the entity under which he bought an interest in the Madison Chase property. Hr'g 07/14/14 Tr., at 166:21-22. The Purchase and Sale Agreement relating to that purchased interest indicates a purchase price of $2.2 million.

(Ex. 26). The settlement statement for this transaction indicates that $200,000 of that $2.2 million was a fee expense. (Ex. 29). Wendell Jacobson testified that Council Properties or one of his entities probably received that fee expense. Hr'g 07/14/14 Tr., at 58:24-59:1. Bowler could not explain the nature of the expense. *Id.*, at 184:4-8. Nor did he know to whom it was paid. *Id.*, at 187:22-24.

Bowler testified that he understood the monthly payments he received reflected the income generated from the Madison Chase property. *Id.*, at 189:6-13. In response to questioning by Doyle Byers, Bowler further testified as follows:

> Q.    Okay. And I will - - I'll represent to you that if you do the math, a payment of $13,333.33 per month would correspond with an 8 percent annual return on a $2 million amount. Do you recall any discussions about receiving payments corresponding to a percentage like that?
>
> A.    Not necessarily.
>
> Q.    Okay. What do you recall about how this was calculated, then?
>
> A.    I don't recall a calculation, per se, a pre calculation. My understanding, when I purchased the property, is that I would - - was supposed to make somewhere between a 5 to an 8, 9 percent, somewhere in that range.
>
> - - - -
>
> Q.    Okay. Are you aware - - are you aware that any funds from other entities related to Mr. Jacobson were used to fund portions of the payments - - portions of those monthly payments to Fountain Green?
>
> A.    I'm not.

*Id.*, at 189:14-25; 191:1-5. Bowler could not recall if there was any agreement in writing regarding those monthly payments. *Id.*, at 190:23-25.

Bowler testified that he never received 1099 or K-1 tax forms. Instead, raw rents and expenses data was sent directly to his accounting firm to be compiled on Bowler's tax return. *Id.*, at 180: 6-17.

### D. MONTHLY PAYMENTS

As discussed above, each of the Intervenor Plaintiffs received regular monthly payments from their purported ownership interest in the Madison Chase property, totaling approximately an 8 percent annual return on their investment in the property.

The monthly funds Intervenor Plaintiffs received were not comprised entirely of revenues from the Madison Chase property. As Wendell Jacobson testified, there were times when the income from the Madison Chase property did not generate enough money to make monthly payments to all interest holders. Hr'g 07/14/14 Tr., at 97:3-8. Jacobson testified that while he would have "trued things up at the end," in the meantime, he transferred funds from other accounts into the Madison Chase account in order to make payments. *Id.*, at 97:7-13.[42] Jacobson could not identify specifically the source of those transferred funds. *Id.*, at 97:14-20.

The Receiver called David Bateman, a certified public accountant for Rocky Mountain Advisory,[43] to testify regarding the monthly payments Intervenor Plaintiffs received. Bateman testified that the monthly payments were paid from a bank account in the name of Management Solutions, Inc. d/b/a Madison Chase Apartments. Hr'g 07/15/14 Tr., at 86:16-21.[44] Relying on a general ledger for a quick books file in the name of Madison Chase 1031 (Ex. 86), Bateman

---

[42]This is consistent with the representations of Intervenor Plaintiffs. *See* Hr'g 09/19/14 Tr., at 13:21-25.

[43]The Receiver, Gil Miller, similarly works at Rocky Mountain Advisory, and David Bateman works with him on the receivership. Hr'g 07/15/14 Tr., at 85:22-86:1.

[44]This is consistent with the parties' stipulations. (*See* Exhibit A, at 16.)

testified that this bank account was funded through three primary sources: (i) transactions identified as rental income from the operations of the apartment complex; (ii) cash transfers from Thunder Bay; and (iii) cash transfers from an entity called Texas Apartments. *Id.,* at 86:22-87:23. When funds were deposited from Thunder Bay and Texas Apartments into the bank account, they were booked as loans. *Id.*, at 88:3-7.[45] While the ledger reflects repayment transactions reducing the intercompany balance periodically, those balances were then re-advanced. *Id.*, at 88:8-12. Bateman testified that "there were book entries but not necessarily actual cash transfers that would move - - that would eliminate the intercompany balance on the last day of the year then to rebook it [sic] in January of the following year." *Id.*, at 88:12-16. By the time the Receiver took over the bank account, Thunder Bay and Texas Apartments were owed $653,600 and $70,100, respectively. *Id.*, at 88:17-89:3; Ex. 86: pg. 40.

Bateman testified that, despite the purported expectation of an annual "true up" of the monthly payments to account for actual cash flow, no adjustments appear to reflect that. *Id.*, at 91:25-92:14.  Intervenor Plaintiffs have submitted no contradictory evidence indicating a meaningful true up—involving an actual exchange of cash—ever occurred.[46]

Referring back to the Madison Chase 1031 General Ledger (Ex. 86), Bateman noted the section spanning pages 43 to 46, which appears to set out payments to and credits for Intervenor Plaintiffs. Hr'g 07/15/14 Tr., at 92:15-21. Bateman testified that the monthly payments to Intervenor Plaintiffs were created in Quick Books as a capital account. *Id.*, at 93:10-19. But he

---

[45]Mr. Bateman stated the funds were booked as "intercompany loans." Hr'g 07/15/14 Tr., at 88:5-7. He clarified that he used the term "intercompany," though the general ledger does not, because the loan was a receivable account for another company. *Id.*, at 100:3-8.

[46]*See* Hr'g 09/19/14 Tr., at 11:16-23.

was unaware of any entity associated with a capital account for Intervenor Plaintiffs. *Id.*, at 93:20-24.

The basic question presented in this equitable proceeding is this: Can one be an absolute equitable owner of an unrecorded interest in real property as the result of a purported purchase and at the same time be a recipient of an income stream based not wholly on property performance but based on the purported purchase price?

One cannot be both an absolute owner and recipient of a defined income stream based on the purported purchase price. Receipt of a defined income stream belies ownership and is more compatible with status as an investor or as a creditor. That incompatibility presents an evidentiary problem to Intervenor Plaintiffs. One cannot show ownership by clear and convincing evidence when one over time has received a defined income stream, part of which came not from property operation but from other sources. Allowing such would be inequitable to "Other sources."

As outlined above, on October 3, 2007, Madison Chase Apartments, which is not an entity,[47] agreed to pay "an 8% APR to Boyd Summerhays, L.C. every month" through monthly payments of $10,000.00. Ex. 77. Between November 2007 and December 2011, Boyd Summerhays, LC received a total of $500,000 in interest payments.[48] Similarly, between November 2007 and December 2011, Gary Williamson received nearly-monthly payment of $3,333.33 for a total of $166,666.50 in payments.[49] And between November 2007 and December 2011, Fountain Green, L.C. received nearly-monthly payments of $13,333.33 for a total of

---

[47] Hr'g 07/14/14 Tr., at 97:21-98:7.

[48] (Exhibit A, at 12-13.)

[49] (*Id.*, at 14.)

$666,666.50 in payments.[50] These payments, though ostensibly projections of what the property's revenue would be, were not directly based on the property's performance. Hr'g 07/14/14 Tr., at 96:23-97:2. There were times when the property's performance did not generate sufficient income to make these monthly payments to Intervenor Plaintiffs. *Id.*, at 97:3-8. Instead, funds from MSI related entities—Thunder Bay and Texas Apartments—were transferred so that the monthly payments could be made. *Id.*, at 97:9-13; Hr'g 09/19/14 Tr., at 13:21-25. The total amount of payments made to the Intervenor Plaintiffs was $1,333,333.00, and more than half, $723,700.00, came from funds that were owed back to Thunder Bay and Texas Apartments. Hr'g 07/15/14 Tr., at 88:17-89:3; 128:6-12; Hr'g 09/19/14 Tr., at 15:7-23; 21:12-18; Ex. 86, at pg. 40; Exhibit A, at 12-14, 16. These funds have not been repaid. Hr'g 07/15/14 Tr., at 88:8-89:3; Hr'g 09/19/14 Tr., at 11:16-23; 16:14-21.

With these payments to Intervenor Plaintiffs, it is difficult to find Intervenor Plaintiffs fully performed (i.e., fully paid the purchase price) under their purchase and sale agreements. The payments Intervenor Plaintiffs provided for their ownership interest were returned through consistent monthly payments from non-property sources. Intervenor Plaintiffs seek to characterize such funds as loans, which they are obligated to pay back but which do not affect their ownership in the Madison Chase property.[51] But the evidence does not support this characterization. Intervenor Plaintiffs have not proffered evidence of an agreement, written or otherwise, between Intervenor Plaintiffs and Thunder Bay or Texas Apartments for a loan of

---

[50](*Id.*, at 16.)

[51](Intervenor Pls.' Post-Trial Br., filed July 25, 2014 (CM/ECF No. 2016), at 4; Reply to Resp. to Intervenor Pls.' Post-Trial Br., filed Aug. 8, 2014 (CM/ECF No. 2052), at 3.)

funds.[52] In fact, as Intervenor Plaintiffs acknowledge, Intervenor Plaintiffs were only made aware of these "loans" during the bench trial.[53]

Without full payment of the purchase price, there is no full performance of Intervenor Plaintiffs' obligations. Thus, equitable title did not vest with Intervenor Plaintiffs:

> Formation of a contract for the purchase and sale of real property passes equitable title to the purchaser. *Chambers County v. TSP Development, Ltd.*, 63 S.W.3d 835, 838 (Tex. App.—Houston [14th Dist.] 2001, pet. denied*); Lefevere v. Sears*, 629 S.W.2d 768, 770 (Tex. Civ. App.—El Paso 1981, no writ). Equitable title is an enforceable right to have legal title transferred to the holder of the equitable right. *City of Houston v. Guthrie*, 332 S.W.3d 578 (Tex. App.—Houston [1st Dist.] Dec. 31, 2009, pet. denied); *Smith v. Dass, Inc.*, 283 S.W.3d 537, 542 (Tex. App.—Dallas 2009, no pet.); *Travis Cent. Appraisal Dist. v. Signature Flight Support Corp.*, 140 S.W.3d 833, 840 (Tex. App.—Austin 2004, no pet.). There is a marked difference between an equitable right and an equitable title with regard to a contract for the sale of real property. *Bradford v. Cole*, 570 S.W.2d 171, 173 (Tex. Civ. App.—Texarkana 1978, writ dism'd). A purchaser under a contract for deed who has not paid the purchase price has only an equitable right which ripens into equitable title superior to the title of the seller when payment is made. *Guzman v. Acuna*, 653 S.W.2d 315, 319 (Tex. App.—San Antonio 1983, writ dism'd). Until the purchaser fully performs his or her obligations under the contract for deed, the purchaser has only equitable rights, not equitable title. *Neeley v. Intercity Management Corp.*, 623 S.W.2d 942, 951 (Tex. App.—Houston [1st Dist.] 1981, no writ).

1 Tex. Prac. Guide Real Estate Litig. § 2:45

That Intervenor Plaintiffs do not have an ownership interest in the Madison Chase property, equitable or otherwise, is consistent with the way Intervenor Plaintiffs and Wendell Jacobson treated the property. There is no evidence that Intervenor Plaintiffs entered into a

---

[52]While the general ledger for the MSI Madison Chase account (Ex. 76) may characterize the transfer of funds from Thunder Bay and Texas Apartments as loans, this does not denote a loan to Intervenor Plaintiffs. *See* Hr'g 09/19/14 Tr., at 15:24-16:15.

[53](Intervenor Pls.' Post-Trial Br., filed July 25, 2014 (CM/ECF No. 2016), at 4.)

written tenant-in-common agreement for the Madison Chase property. Hr'g 07/14/14 Tr., at 192:7-9; Hr'g 07/15/14 Tr., at 18:6-8. Furthermore, though Intervenor Plaintiffs reported rental income from the Madison Chase property on their tax returns, they have not explained the discrepancy between the total amount of payments they received over the course of a year and the net rental income they reported on their taxes.[54]

Additionally, there is no evidence that Intervenor Plaintiffs entered into a written management agreement with MSI for MSI's management of the Madison Chase property on behalf of Intervenor Plaintiffs. Hr'g 07/14/14 Tr., at 84:22-85:5; 191:16-19; Hr'g 07/15/14 Tr., at 18:2-5. Although ostensibly the agent of Intervenor Plaintiffs as the property manager, Wendell Jacobson was able to unilaterally decide to take money from MSI-related entities (but entities otherwise unrelated to the Madison Chase property) and give that money to Intervenor Plaintiffs. Jacobson provided such money, despite Intervenor Plaintiffs purported entitlement to only property revenues. And Jacobson seems to have never made an effort to request back or otherwise meaningfully "true up" these transferred funds.

In light of these considerations and conclusions, the court finds that Intervenor Plaintiffs did not make full payment of the purchase price under their respective agreements for an interest in the Madison Chase property. As such, there was no full performance of their agreement obligations and no vesting of equitable title.

This is a hard case and in many ways troublesome. While Intervenor Plaintiffs in this instance may have been taken advantage of by others, a careful follow through at the time of

---

[54]For example, with an agreement for $10,000 per month, Boyd Summerhays, LC received a total of $120,000 in payments for 2011. Ex. 86, 97. But in its 2011 tax return, Boyd Summerhays, LC only reported $9,623 in net rental income. Ex. 45. (*See* Resp. to Intervenor Pls.' Post-Trial Br., filed Aug. 6, 2014 (CM/ECF No. 2045), at 5.)

purported settlement, seeing to it that important documents be placed of record, and being content with the good and bad of property operation would have been of immense help in sorting out the Jacobson saga.

## CONCLUSION

Having determined that Intervenor Plaintiffs have not demonstrated by clear and convincing evidence their full performance under their respective purchase and sale agreements, the court finds their claims for ownership interest in the Madison Chase property are DENIED.

Notwithstanding this finding, each of the Intervenor Plaintiffs remains entitled to file a general claim in the receivership proceedings.

DATE this **13th** day of November, 2014.

Bruce S. Jenkins
United States Senior District Judge